David A. VanLANDSCHOOT,
Respondent,

v.

CITY OF MENDOTA HEIGHTS, Dakota
County, Minnesota, Appellant.

No. C5–82–1178.

Supreme Court of Minnesota.

July 8, 1983.

Winthrop, Weinstine & Sexton, Steven C. Tourek and Wendy Willson Legge, St. Paul, for appellant.

Lais, Gannigan & Ciresi and John F. Bannigan, Jr., St. Paul, for respondent.

KELLEY, Justice.

Appellant, City of Mendota Heights (City), appeals from a judgment of the Dakota County District Court ordering the City to grant respondent VanLandschoot's application for the subdivision of Lot 18, Linden Addition to the City of Mendota Heights (Lot 18) and, further, to grant him certain requested variances in order to allow him to build two houses on the subdivided lots. The trial court concluded the City's action in denying the application for subdivision and the variances incident thereto was arbitrary, unreasonable and capricious. We reverse.

In 1976, Ronald Smith, respondent's predecessor in title to Lot 18, applied to the City for subdivision of Lot 18 into two parcels. In connection with that application, Smith requested the City vacate a 30-foot right-of-way adjacent to the southern border of the proposed west lot so as to enable him to comply with the City's 30-foot frontyard setback requirement. This application was denied by the city council. During the time of his ownership, Smith placed fill on the lakeshore of Rogers Lake abutting Lot 18 in violation of the City's ordinances and the Minnesota Department of Natural Resources (DNR) rules and reg-

ulations. As a result of this filling, Lot 18 was increased by approximately 7,000 square feet and the shoreline configuration was altered. Otherwise, except for some grading, Smith did not improve the property.

In 1978, respondent, a lawyer and real estate developer, purchased from Smith all of Lot 18. At the time of the sale, Smith advised respondent that the proposed subdivision of the lot had not been approved by the City, but that, in Smith's opinion, the proposed plan appeared to meet subdivision requirements of the City. Respondent claims that when he purchased the property he was unaware that variances would be needed in order to erect two houses on a subdivided Lot 18. Respondent hired an architect and met with Howard Dahlgren, the City's planning consultant. Dahlgren informed respondent of the previous events affecting the property during Smith's ownership. He also suggested respondent obtain confirmation from the DNR that it approved the fill Smith had placed along the northern part of Lot 18. Moreover, he urged respondent to make application for subdivision of Lot 18 before commencement of any construction on the west part of Lot 18 because there was no guarantee the City would approve a proposed subdivision plan. Also at that conference, respondent was informed that three or four variances would be necessary before buildings could be built on the proposed subdivided lot.

Subsequently, respondent filed an application with the City's planning commission for a subdivision of the property into two residential lots and for three variances. The proposal divided Lot 18 into an east and a west lot. Three variances would be necessary to build a house on the west lot: (1) from the City's wetland ordinance which requires a 100-foot setback from the water control level to a distance of 85 feet; (2) from the 30-foot frontyard setback requirement to a distance of 23.5 feet; and (3) from a requirement of frontage on a 60-foot right-of-way to allow frontage on the existing 30-foot right-of-way and also to construct a driveway over a portion of that right-of-way. Moreover, on the east lot a variance from the 100-foot wetland setback would be necessary to allow construction of the house respondent planned to erect on it, although it would have been possible to build a different style and size house on the east lot without any variance.

The City's planning commission met on August 28, 1979. At the meeting, respondent testified and submitted documents in support of his proposal. Considerable neighborhood opposition was voiced at the meeting—mostly because allowing the subdivision would allow Smith and respondent to profit by the illegal activity of putting in unauthorized fill on the shoreline of Rogers Lake. A motion to recommend approval of the subdivision together with the requested variances, subject to the condition that the unauthorized-fill matter be resolved to the DNR's satisfaction, received a 3 to 3 vote. One member of the planning commission was absent but later submitted a letter that had he been present at the meeting he would have voted in favor of the proposed subdivision. About a month later, the DNR indicated that at that late date it would not be in the public interest to require respondent to modify the shoreline where the unauthorized fill had been placed by Smith, and that it was closing its file leaving land use matters to local decision.

Respondent explained his plans and answered questions concerning his proposal at a city council meeting on November 6, 1979. He claimed that, unless the application was approved, he, as landowner, would experience hardships. The hardships claimed were ongoing real estate taxes, the cost of landscaping and maintenance, and the cost of erecting a house sufficiently substantial for a 72,000 square foot lot. A petition in opposition, containing 103 signatures of neighboring landowners, was likewise submitted to the council. This hearing was continued until November 20, 1979. Respondent appeared at this second hearing in person and with counsel. Some council members opined that denial of the application would not result in "hardship" as defined by applicable statute and ordinance. Rather, some council members thought, the

application was solely for respondent's economic gain and convenience. Council members also discussed consequences likely to follow from respondent's plan to have a private driveway on the public right-of-way south of the proposed west lot. Concern was expressed that such a use would have a detrimental impact on the use of the right-of-way by emergency vehicles; potential problems that might arise concerning maintenance of the right-of-way; and potential liability problems that might arise as the result of such dual use. Following the discussion, the council adopted Resolution 79–119 denying respondent's application by unanimous vote.[1] One week later, respondent filed an Application for Consideration of Planning Request seeking a variance to build one house on Lot 18 without subdivision. Six weeks later, this application was withdrawn and this declaratory judgment action was commenced.

On appeal to the district court, additional evidence was submitted regarding the issue of necessity of the proposed subdivision and the variances, the effect the granting of them would have on the community, and the hardships respondent would experience if prohibited from subdividing. Respondent admitted he could build a home on Lot 18 if not subdivided and if the requested variances were denied, but contended he would have to build on the eastern portion of the lot—an option he considered less desirable than building on the western portion. With respect to hardship, respondent claimed first, it would be a hardship to landscape and maintain a 72,000 square foot lot; second, it would be a hardship to pay taxes on the entire lot although he conceded a property owner's real estate tax assessment is primarily determined by the size and quality of the house rather than lot size;

and third, that it would be hardship to maintain the image of having the "largest estate" in the community. Respondent admitted the public might be deterred from using the public right-of-way to Rogers Lake if it doubled as a private driveway, though he denied its use as a driveway would create problems with snowplowing and removal.

On the other hand, other witnesses stressed the likelihood of diminished use of the lake access road if it was a private driveway. The City's engineer testified that, because of existing storm sewers and a ditch, the roadway would be only 15 feet wide, which would make snow removal difficult because of lack of space for snow storage and inadequate room to maneuver snow plows. Evidence was also provided that the City had never issued three or more variances to make a lot buildable, nor had the City ever granted a variance from the requirement of fronting on a 60-foot right-of-way, nor had the City ever permitted the construction of a private driveway over a public right-of-way. Further evidence presented by the City was that the 60-foot right-of-way requirement in its ordinance is to allow access for public and emergency vehicles as well as to provide sufficient room for snow removal and storage and location of public utilities. Moreover, evidence indicated the 30-foot front-yard setback requirement is required not only for aesthetic reasons but also to create a buffer between traffic noise and dirt of the public right-of-way and the residence. The 100-foot wetland setback is required by Minnesota law and an ordinance adopted by the City. City officials maintained that it was important to maintain public access to Rogers Lake. This access, the City contended, would be impaired if respondent

---

1. This resolution, after citing facts concerning the history of Lot 18 and its acquisition by respondent, continued with findings concerning flooding problems and traffic safety, convenience and snow removal. It further found the proposed subdivision would be contrary to the City's comprehensive plan; would not be in keeping with present and expected character and future development of the area; that there were shown no conditions peculiar to this property as compared to other properties bordering on Rogers Lake; that the subdivision was "contrary" to the health, safety and welfare of the community; that it would present adverse safety and traffic conditions; that there was no basis for a claim of hardship attributable to the land; and that granting the application was unnecessary for the preservation and enjoyment of respondent's property rights.

was given permission to construct a private driveway over the public right-of-way. Concerns were also expressed by city officials over potential problems likely to occur if the private driveway were permitted relating to tort liability and road maintenance.

The Minnesota legislature has delegated to municipalities the power to determine and plan the use of land within their boundaries. Minn.Stat. § 462.351 (1982). It has further provided that the municipalities may grant variances to zoning and planning ordinances where strict enforcement would cause "undue hardship." The statute defines "undue hardship" to mean that the property cannot be put to reasonable use if used under conditions allowed by the ordinance; the plight of the landowner is due to circumstances unique to the property not created by the landowner; and the variance requested will not alter the essential character of the locality. The statute specifically provides that "[e]conomic conditions alone" shall not constitute an undue hardship. Minn.Stat. § 462.357, subd. 6 (1982). Finally, the legislature broadly set forth the authority and procedures granting municipalities the power to regulate subdivisions. Minn.Stat. § 462.358 (1982).[2] Mendota Heights, pursuant to this statutory scheme, has adopted a comprehensive plan. In addition, it has enacted a zoning ordinance.[3] Ordinance No. 301 regulates subdivision

2. In relevant parts, Minn.Stat. § 462.358 (1982) provides:

> Subd. 1a. *Authority.* To protect and promote the public health, safety, and general welfare, to provide for the orderly, economic and safe development of land, to preserve agricultural lands, to promote the availability of housing affordable to persons and families of all income levels, and to facilitate adequate provision for transportation, water, sewage, storm drainage, schools, parks, playgrounds, and other public services and facilities, a municipality may by ordinance adopt subdivision regulations establishing standards, requirements, and procedures for the review and approval or disapproval of subdivisions. * * *
>
> * * * * * *
> Subd. 2b. *Dedication.* The regulations may require that a reasonable portion of any proposed subdivision be dedicated to the public or preserved for public use as streets, roads, sewers, electric, gas, and water facilities, storm water drainage and holding areas or ponds and similar utilities and improvements.
>
> * * * * * *
> Subd. 6. *Variances.* Subdivision regulations may provide for a procedure for varying the regulations as they apply to specific properties where *an unusual hardship* on the land exists, but variances may be granted only upon the specific grounds set forth in the regulations. * * *

(emphasis added)

3. Mendota Heights Ordinance No. 401, insofar as relevant to the issues of this case, reads:

> 4.12 *Land Reclamation*—Under this Ordinance Land Reclamation is the reclaiming of land by depositing of material so as to elevate the grade. Land reclamation shall be permitted only by a conditional use permit in all districts. Any lot or parcel upon which four hundred (400) cubic yards or more of fill is to be deposited shall be land reclamation. * * *
>
> 5.5(4) *Issuance*—In considering applications for variance under this Ordinance, the Council shall consider the advice and recommendations of the Planning Commission and the effect of the proposed variance upon the health, safety, and welfare of the community, existing and anticipated, traffic conditions, light and air, danger of fire, risk to the public safety, and the effect on values of property in the surrounding area, and the effect of the proposed variance upon the Comprehensive Plan. If the Council shall determine by resolution that the special conditions applying to the structure or land in question are peculiar to such property or immediately adjoining property, and do not apply generally to other land or structures in the district in which said land is located, and that the granting of the application is necessary for the preservation and enjoyment of a substantial property right of the applicant and that granting the proposed variance will not impair an adequate supply of light and air to adjacent property, unreasonably increase the congestion in the public streets, increase the danger of fire, endanger the public safety, unreasonably diminish or impair established property values in the surrounding area, or in any other way impair health, safety, comfort, morals, or in any other respect be contrary to the intent of this Ordinance *and that the granting of such variance will not merely serve as a convenience to the applicant, but is necessary to alleviate demonstrable hardship or difficulty, the Council may grant such variance and impose conditions and safeguards therein.*

(emphasis added)

plats.[4] Also having a bearing on the issues is the Wetland Ordinance No. 402.[5]

Our duty in considering zoning cases is to review the decision of the city council independent of the findings and conclusions of the district court. *Northwestern College v. City of Arden Hills,* 281 N.W.2d 865, 868 (Minn.1979); *White Bear Docking and Storage, Inc. v. City of White Bear Lake,* 324 N.W.2d 174, 176 (Minn. 1982); *Town of Grant v. Washington County,* 319 N.W.2d 713, 717 (Minn.1982). Regardless of whether the zoning matter is legislative (rezoning) or quasi-judicial (variances and special-use permits), we determine whether the municipality's action in the particular case was reasonable.[6] We examine the municipality's action to ascertain whether it was arbitrary and capricious, or whether the reasons assigned by the governing body do not have "the slightest validity" or bearing on the general welfare of the immediate area, *White Bear Docking,* 324 N.W.2d at 176, or whether the reasons given by the body were legally sufficient and had a factual basis. *C.R. Investments, Inc. v. Village of Shoreview,* 304 N.W.2d 320, 325 (Minn.1981).

A municipal decisionmaking body has a broad discretionary power to deny an

4. Relevant portions of the subdivision ordinance are:

1.4 APPROVALS NECESSARY FOR ACCEPTANCE OF SUBDIVISION PLATS
Before any plat shall be recorded or be of any validity, it shall be referred to the City Planning Commission and approved by the City Council of Mendota Heights as having fulfilled the requirements of this Ordinance.
5.2(4) Every lot must have the minimum frontage as required in the Zoning Ordinance on a City approved street other than an alley.
5.3(9) For all public ways hereafter dedicated and/or accepted, the minimum right-of-way width for streets * * * included in any subdivision shall not be less than the minimum dimensions as follows:

|   |   |
|---|---|
| * * * * * * | |
| Minor Street | 60 feet |
| Cul-de-sac or Marginal Access | |
|    Service Streets | 60 feet |
| * * * * * * | |

9.1(1) The Planning Commission may recommend a variance from the provisions of this Ordinance when, in its opinion, undue hardship may result from strict compliance. In recommending any variance, the Commission shall prescribe only conditions that it deems necessary to or desirable for the public interest. In making its recommendations, the Planning Commission shall take into account the nature of the proposed use of land and the existing use of land in the vicinity, the number of persons to reside or work in the proposed subdivision and the probable effect of the proposed subdivision upon traffic conditions in the vicinity. A variance shall only be recommended when the Planning Commission finds:
(a) That there are special circumstances or conditions affecting said property such that the strict application of the provisions of this Ordinance would deprive the applicant of the reasonable use of his land.
(b) That the granting of the variance will not be detrimental to the public welfare or injurious to other property in the territory in which property is situated.
(c) That the variance is to correct inequities resulting from an extreme physical hardship such as topography, etc.
After consideration of the Planning Commission recommendations, the City Council may grant variances, subject to (a), (b) and (c) immediately above.

5. Relevant portions of the wetland ordinance are:

SECTION 2. *District Boundaries.* This Ordinance shall apply to wetlands and water resource related areas and to adjacent land within one hundred (100) feet of normal high water markers of wetlands and water resource related areas as delineated on the official City "Wetlands Systems Map."
SECTION 6. *Wetlands Permit.*
A. No person shall perform any action upon or otherwise alter a Wetland or Water Related Resource Area without first obtaining a written permit from the City.
B. The following activities in or upon a Wetlands or Water Resource Related Area shall require a permit:
1. The deposit or removal or permitting the deposit or removal of any debris, fill or any other material over one hundred (100) cubic yards;
    * * * * * *
4. The construction, alteration, or removal of any structure;

6. This court has said that "in special-use permit cases, 'reasonableness' is measured by the standards set out in the local ordinance, and not by the standards contained in the statute." *White Bear Docking and Storage, Inc. v. City of White Bear Lake,* 324 N.W.2d 174, 176 (Minn. 1982); *see Honn v. City of Coon Rapids,* 313 N.W.2d 409, 417 (Minn.1981). This principle should also apply to decisions about subdivisions and variances since municipalities have been given the same broad discretion to decide these matters.

application for variances.[7] The fact that a court reviewing the action of a municipal body may have arrived at a different conclusion, had it been a member of the body, does not invalidate the judgment of the city officials if they acted in good faith and within the broad discretion accorded them by statutes and the relevant ordinances. *White Bear Docking,* 324 N.W.2d at 176. Based upon an independent examination of the record, we must determine whether the City's denial of respondent's application for subdivision was reasonable.[8]

An analysis of respondent's application for subdivision of Lot 18 and for four variances indicates that the request was based upon alleged hardship. Since respondent was seeking variances from zoning, subdivision and wetland ordinances to allow use of Lot 18 in a way prohibited by these ordinances, he had a heavy burden to demonstrate reasons why he was entitled to the requested action. *Luger v. City of Burnsville,* 295 N.W.2d 609, 612 (Minn.1980). There was evidence that denial of the application did not deprive respondent of reasonable use of his property. In fact, after his application was denied he made application for building one house on Lot 18 (subsequently withdrawn), which indicates there was reasonable use for the property. Also, there was evidence that he might have been entitled to a refund of his money from his vendor.[9] Finally, there was evidence that the lot had resale value.

Furthermore, the council could have rationally concluded, as it did, that the plight of respondent was not due to circumstances "unique to his property." It rationally could have found, as it did, that some of the problems were the result of illegal acts of respondent's predecessor in title, of which respondent was aware at the time he acquired title. It is clear that respondent's proposed subdivision of Lot 18 combined with the requested variances would violate the City's comprehensive plan, particularly that part of the plan requiring subdivisions to be planned so as to provide access within and between neighborhoods for public safety and service vehicles. Moreover, the fact that application would affect frontyard setbacks and 60-foot right-of-way frontage provided by the City's ordinance, which were enacted for aesthetic reasons, as well as for the health and welfare of the area, provided a rational basis for the council's finding that granting those two requested variances would adversely affect the health and welfare of the neighborhood and community. From the evidence, the council could have rationally found the request to build a private driveway over a portion of the public right-of-way would have tended to deter the public from using the right-of-way to gain access to Rogers Lake; would have made problems in connection with snowplowing and removal; and was fraught with problems of tort liability claims and maintenance, and therefore would raise safety and traffic condition problems.

The "undue hardships" on which respondent based his application were pri-

---

7. *See Zylka v. City of Crystal,* 283 Minn. 192, 196, 167 N.W.2d 45, 49 (1969); *Barton Contracting Co., Inc. v. City of Afton,* 268 N.W.2d 712, 717 (Minn.1978). Both of these cases involve denial of a special-use permit. We have recognized the definitional differences between variances and special-use permits, but we have treated them identically for purposes of scope and standard of review. Because of the similarity of treatment and the municipality's statutory power to grant or deny a variance, municipalities have the same discretion in the denial of variances as they do in the denial of a special-use permit.

8. The record includes the evidence before the city council at the time of its decision as well as any new or additional evidence received at the trial that is relevant to the issues raised and considered by the city council. *Honn v. City of Coon Rapids,* 313 N.W.2d 409, 416 (Minn.1981).

9. There was some dispute about this. Respondent claimed that Smith had agreed to refund all amounts paid on the contract if respondent's application for subdivision was denied. Smith claimed he agreed to terminate the contract only if nothing could be built on Lot 18. Whichever version of that dispute is accepted, taking into consideration the other facts, denial of the application would not necessarily deprive respondent of reasonable use of his property.

marily concerned with the cost of owning and maintaining a large lot. Under Minn. Stat. § 462.357, subd. 6(2) (1982) and Mendota Heights Ordinance No. 401.5.5(4), the council could have rationally concluded this kind of hardship was insufficient to justify granting the subdivision and the requested variances. In our view, the council's decision was not arbitrary, capricious or unreasonable. In its zoning history, the City has never granted three variances to make one lot buildable. Allowing a private driveway over a public right-of-way so as to create problems of tort liability, public safety, access to Rogers Lake and snow removal and storage would affect the public health, safety and welfare. Allowance of a variation from the requirement that a lot front on a 60-foot right-of-way would be contrary to the City's goal for open spaces.

Because we find, under our scope and standard of review, a rational basis for the action of the City in denying the application for subdivision and the requested variances, we reverse.

Reversed.