**NORTHWEST RESIDENCE, INC., Petitioner, Appellant (C1–83–1379),**

and

**Rita Smith, et al., Petitioners, Appellant (C7–83–1290),**

v.

**The CITY OF BROOKLYN CENTER, Respondent.**

Nos. C7–83–1290, C1–83–1379.

Court of Appeals of Minnesota.

June 19, 1984.

Thomas Bennett Wilson, III, Edina, for appellant (C1–83–1379).

Susan L. Lentz, Eric Janus, Legal Aid Society of Minneapolis, Inc., Minneapolis, for appellant (C7–83–1290).

Richard J. Schiefer, James J. Thomson, Jr., LeFevere, Lefler, Kennedy, O'Brien & Drawz, Minneapolis, for respondent.

Hubert H. Humphrey, III, Atty. Gen., Mary Ann Bernard, Sp. Asst. Atty. Gen., St. Paul, for amici curiae, Leonard W. Levine, Commissioner of Public Welfare, Sister Mary Madonna Ashton, Commissioner of Health.

Heard, considered and decided by SEDGWICK, P.J., and PARKER and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

This is an appeal from a district court order denying a writ of mandamus to compel the City of Brooklyn Center to issue a special use permit for a group home for eighteen mentally ill adults. The appellants, whose cases have been consolidated for appeal, are Northwest Residence, Inc., a corporation that wants to open the group home, and five mentally ill persons who want to reside there.

The Brooklyn Center City Council denied the special use permit based on a number of findings, including inadequate parking and recreational facilities, and diminution of enjoyment of adjacent property. Even though municipal occupancy standards would allow at least eighteen people to live in the particular structure, the City Council also denied the special use permit on the ground that the building contains adequate space for twelve mentally ill people. Only the last ground was found by the trial judge to be an adequate basis for denying the permit.

On appeal, appellants contend that they were wrongfully denied a writ of mandamus. They argue that Northwest Residence meets all requirements for a special use permit and that Brooklyn Center

lacked authority to establish a special occupancy standard for mentally ill adults that is more stringent than state laws on the same subject.

We reverse and remand.

## FACTS

### A. The Facility

On April 29, 1983, Diane Wright, President and Chief Executive Officer of Northwest Residence submitted an application to the City of Brooklyn Center requesting a special use permit to use a fourplex at 4408 69th Avenue North as a residential facility for mentally ill adults. The fourplex is located in an R–4 (Multiple Family Residence District) zone. Under Brooklyn Center City Ordinance § 35–313(3), boarding homes are permitted special uses in R–4 zoning districts.

Each unit in the fourplex contains a kitchen and dining area, two two-person bedrooms, a living room and bathroom. The group home proposal, as finalized, would convert two kitchens into one-person bedrooms and one kitchen into an office. Two of the units would thus house four residents and two units would house five residents.

The target population of the facility, according to Wright's special use permit application, is "chronically mentally ill adults over the age of 21, with severe persistent mental or emotional disorders which severely limit their functioning capabilities relative to primary aspects of daily living." Residents must be non-violent and able to monitor their own medications.

The facility program is geared toward helping residents learn to utilize community resources and develop independent living and prevocation skills. Wright testified that "we are considered the level of care just prior to when a person would be ready to live independently in an apartment, perhaps under supervision."

### B. The Application Process and Trial Court Decision

Brooklyn Center requires that special use permit applications be referred to the City Planning Commission and then to the City Council. Brooklyn Center City Ordinance § 35–220. Planning Commission staff recommended approval of the application on May 12, 1983, concluding that the Northwest application met the standards for issuance of special use permits under Brooklyn Center City Ordinances § 35–220. On that same date, the Planning Commission held a public hearing on the application and voted 4–2 to recommend approval, subject to some limited conditions, including presence of at least one qualified mental health worker on the premises at all times; a limitation on the number of parking spaces for client vehicles; and compliance with applicable state and local regulations. Wright is able and willing to abide by all such conditions.

Following public hearings, however, the Brooklyn Center City Council denied the special use permit application based on a number of findings. The thrust of these findings was that parking and recreational facilities at the site were inadequate; heavy traffic on 69th Avenue and the absence of sidewalks would create unsafe conditions for both residents and motorists; activity resulting from the proposed use would diminish enjoyment of adjacent property owners; the proposed home would be an expansion of a non-conforming use; and the structure contains space for only twelve mentally ill people.

Appellants sought and were denied a writ of mandamus compelling the Brooklyn Center City Council to issue a special use permit. After a non-jury trial on the matter, the trial judge concluded that the City Council findings involving parking, recreational space, and diminution of property enjoyment were not supported by the evidence; that the group home would not result in expansion of a non-conforming use; and that "the application complies about as well as any could with the zoning regulations." Nevertheless, because of the occupancy finding the trial judge declined to issue the writ since the testimony "clearly established that whether the facility would

adequately house only 12 or perhaps 16 or 18 mentally ill residents was a matter that was at least 'reasonably debatable.' "

## ISSUE

Are the findings made by the Brooklyn Center City Council legally and factually sufficient to deny a special use permit to Northwest Residence, Inc.?

## ANALYSIS

A.  Scope of Review

The Minnesota Supreme Court has established that the standard for review in all zoning matters, whether legislative in nature (rezoning) or quasi-judicial (variances and special use permits) is:

> whether the zoning authority's action was reasonable. Our cases express the standard in various ways: Is there a "reasonable basis" for the decision? or is the decision "unreasonable, arbitrary, or capricious"? or is the decision "reasonably debatable"?

*Honn v. City of Coon Rapids*, 313 N.W.2d 409, 417 (Minn.1981).

A later case, *VanLandschoot v. City of Mendota Heights*, 336 N.W.2d 503 (Minn. 1983), suggests that in determining the reasonableness of a zoning action, a reviewing court should examine "whether the reasons assigned by the governing body do not have 'the slightest validity' or bearing on the welfare of the immediate area..." (quoting *White Bear Docking and Storage, Inc. v. City of White Bear Lake*, 324 N.W.2d 174, 176 (Minn.1982)), or "whether the reasons given by the body were legally sufficient and ... (have) a factual basis." *VanLandschoot*, 336 N.W.2d at 508.

The standard of reasonableness has constitutional importance when municipal action affects important rights of a vulnerable class of people, such as those who are mentally ill. *J.W. v. City of Tacoma*, 720 F.2d 1126 (9th Cir., 1983).

■ Reasonableness in special use permit cases is to be measured by the standards set forth in the particular local ordinance. In *Hay v. Township of Grow*, 296 Minn. 1, 5, 206 N.W.2d 19, 22 (1973), the Minnesota Supreme Court stated:

> It is now settled that where a zoning ordinance specifies standards to apply in determining whether to grant a special-use permit and the applicant fully complies with the specified standards, a denial of the permit is arbitrary as a matter of law. *Zylka v. City of Crystal*, 283 Minn. 192, 167 N.W.2d 45 (1969); *Inland Const. Co. v. City of Bloomington*, 292 Minn. 374, 195 N.W.2d 558 (1972).

The reasonableness of the Brooklyn Center City Council findings must thus be measured against the standards for issuance of a special use permit under Brooklyn Center Municipal Ordinance § 35–220(2), namely:

A special use permit may be granted by the City Council after demonstration by evidence that all of the following are met:

a.  The establishment, maintenance or operation of the special use will not be detrimental to or endanger the public health, safety, morals, or comfort.

b.  The special use will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted nor substantially impair property values within the neighborhood.

c.  The establishment of the special use will not impede the normal and orderly development and improvement of surrounding property for uses permitted in the district.

d.  Adequate measures have been or will be taken to provide ingress, egress and parking so designed as to minimize traffic congestion in the public streets.

e.  The special use shall, in all other respects, conform to the district in which it is located.

and other applicable Brooklyn Center ordinances.

■ A reviewing court must make an independent examination of a city council decision without according any special deference to the same review conducted by the

trial court. *Honn,* 313 N.W.2d at 415 (citing *Northwestern College v. City of Arden Hills,* 281 N.W.2d 865, 868 (Minn.1979). The record for review is:

> the evidence before the city council at the time of its decision as well as any new or additional evidence received at the trial that is relevant to the issues raised and considered by the city council. (citing *Honn v. City of Coon Rapids,* 313 N.W.2d 409, 416 (Minn.1981)).

*VanLandschoot v. City of Mendota Heights,* 336 N.W.2d 503, 509, n. 8 (Minn. 1983).

### B. Parking

■ Brooklyn Center requires a minimum of two parking spaces per dwelling unit for residences. Brooklyn Center Municipal Ordinance § 35–704. No special reference to boarding homes is made in the parking space ordinance. Also bearing on parking requirements are the standards for special use permits, Brooklyn Center Municipal Ordinance § 35–220(2)(d). This section provides that adequate measures must be taken to provide ingress, egress and parking so that traffic congestion on public streets will be minimized.

The fourplex in question has only six parking spaces, but Wright amended her group home proposal to add two parking spaces for the total of eight spaces required by the parking ordinance. Nevertheless the Brooklyn Center City Council found that the site lacked sufficient parking for staff, residents, visitors, and service and delivery vehicles. We conclude, as did the trial judge, that there is no reasonable basis to believe that parking space at the proposed group home would be inadequate.

Relatively little testimony either at trial or the public hearings was devoted specifically to parking problems. The mayor of Brooklyn Center did state at trial "at least nine (parking spaces) were needed as we counted them up at the hearing." The hearing record, however, does not appear to allude to nine spaces. One city council member stated, at a public hearing that occurred before the proposal was amended to add two parking spaces, that eight parking spaces would be necessary. At trial, Diane Wright testified that at most there would be six staff cars in the parking lot; that from 5 p.m. to 8 p.m. there would be two staff people on duty and from 8 p.m. to 8 a.m. there would be one staff person on duty. She also testified that most visitors would arrive after daytime hours when staff parking would be at a minimum. Moreover, most group home residents would be unable to afford cars and Wright testified that she was willing to abide by the Planning Commission recommendation that client vehicles be limited to two vehicles on the premises. She said the only delivery would be a milk delivery once or twice a week.

### C. Inadequate Recreational Facilities

■ The Brooklyn Center City Council made two findings concerning recreational facilities at the proposed site. The first of these findings was set forth in a resolution denying Northwest the special use permit dated June 13, 1983, and the second finding was set forth in a supplemental resolution containing additional findings for denying the permit dated August 8, 1983. This supplemental resolution was passed after the trial court ordered the City Council to consider amended occupancy and parking plans for the facility.

In the June 13, 1983 resolution, the City Council found that "outdoor recreation facilities at the site are almost nonexistent due to lack of space" and that pedestrian travel to the nearest park would be unsafe for residents, neighbors, and motorists due to heavy traffic and the absence of sidewalks. On August 8, 1983, the City Council found that the proposed increase from six parking spaces to eight spaces "reduces the outdoor living space, which is already inadequate for 18 mentally ill persons."

The Brooklyn Center zoning ordinances do not specifically refer to requirements for recreational space. Presumably, the two findings are based on the requirement that special uses must not "endanger the public health, safety, morals, or comfort,"

Brooklyn Center Municipal Ordinance § 35–220(2)(a), and the fact that the lot is substandard in size. Brooklyn Center Municipal Ordinance § 35–400 requires a land area of 14,400 square feet for a fourplex in an R–4 zoning district and this lot contains 9,400 square feet. (The lot is a non-conforming use because of several site characteristics, though it is a legal non-conforming use because the non-conformities predated the zoning ordinance.)

The trial court concluded that the evidence available to the City Council supported "in some degree, greater or less its findings ... but not necessarily that the granting of a special use permit would be in violation of any of the five standards of Section 35–220 ...", and that matters concerning recreational facilities "were testified to and acknowledged properly by the Council, but the effect of such matters was not demonstrated as being greater than if the property units were occupied by the typical four families ... instead of 18 mildly mentally ill persons." And, referring to the final resolution, the trial court stated that the evidence did not support a denial of the permit based on lack of recreational facilities and that this matter was "no more germane here than if the building were housed by people more fortunate."

On examining the record in this case, we conclude, as did the trial judge, that denial of the special use permit based on inadequate recreational facilities is not reasonably supported by the evidence.

The sole testimony at trial that recreational facilities were inadequate was offered by Dr. Hector Seller, a psychiatrist hired by the City who evaluated the site as a potential group home for mentally ill adults. Seller stated that "one of the greatest needs (of mentally ill adults) is to learn how to resocialize ... to find adequate recreational activities since they are usually very deprived in these areas ..." and that recreational facilities at the site would be inadequate. The overwhelming testimony, however, was that on-site recreational space would be adequate particularly in light of the fact that the group home

program emphasizes community activities. For example, Marjorie Wherley, a Residential Program Consultant at the Hennepin County Mental Health Division, whose department determined that recreational facilities at the site would be adequate before entering into a purchase of service agreement with Diane Wright, testified that prospective group home residents would not have on-site recreational needs different from any other adult because the target population was physically active and mobile and that residents would likely be encouraged to engage in off-site activities such as jogging and concerts. Additional witnesses who testified about the adequacy of recreational facilities also had a working knowledge of the recreational needs at group homes for the mentally ill, namely a Senior Clinical Psychologist and the Director from the Hennepin County Mental Health Division. These particular, explanatory, convincing views of officials on recreational needs make it unreasonable to accept instead a general opinion of a single witness.

### D. Traffic Hazards

■ A further reason cited by the Brooklyn Center City Council for denial of the special use permit related to unsafe traffic conditions. Specifically, the City Council found that heavy traffic on 69th Avenue and the absence of sidewalks would result in "unsafe conditions" for residents, neighbors, and motorists. Again, the City Council presumably made this finding pursuant to Brooklyn Center Municipal Ordinance § 35–220(2)(a), which requires that special uses will not "endanger the public health, safety, morals, or comfort." The trial judge concluded that the evidence did not support denying the special use permit based on contemplated traffic hazards and, as in the case of recreational facilities, that "(t)hese matters are no more germane here than if the building were housed by people more fortunate." We conclude, as did the trial judge, that denial of the permit based on unsafe traffic conditions is not reasonably supported by the record.

The evidence showed that the traffic on 69th Avenue was indeed heavy. General concern about unsafe pedestrian conditions was first raised at the Planning Commission hearing, though the Planning Commission nevertheless recommended approval of the special use permit. Absence of sidewalks was mentioned in passing at a City Council hearing. At trial, the sole witness expressing a concern over traffic hazards was Dr. Seller. Seller stated that residents could be over-medicated or confused; he was concerned that they just might "wander into the street and not be aware that there is no curb ..." Overwhelming testimony, however, was that mentally ill adults have no particular difficulty crossing streets. This testimony was again offered by the employees who work for the Hennepin County Mental Health Division.

### E. Diminution of Enjoyment of Adjacent Property

■ The Brooklyn Center City Council also denied the special use permit based on a finding that activity and congestion from the proposed use would diminish the use and enjoyment of the adjacent property. Authority for denial on this ground is Brooklyn Center Municipal Ordinance § 35–220(2)(b). This section essentially requires that special uses must not injure the enjoyment of other property in the immediate vicinity, nor substantially impair property values in the neighborhood.

Planning Commission staff, at the first stage of the application process concluded that "(t)he proposed use enhances the general welfare by providing a necessary service to mentally ill adults, many of whom are from this area;" that the proposed use may present some risk to public health, safety, and comfort, "but this risk does not seem unacceptable particularly in light of the fact that persons with any history of violence toward themselves or others will not be admitted to this facility;" and that "(t)he proposed use should not impair the normal use or enjoyment of surrounding property." The Commission staff recommended approval of the permit. At the

ensuing public hearings held by both the Planning Commission, (which recommended approval of the application), and the City Council, neighborhood residents expressed concern about acts of aggression by group home residents; reduction in property values; noise; and increased occupancy due to the proposed facility. No evidence was presented at the hearings or the trial to support these concerns. Evidence was presented, however, to show that the proposed home would not result in diminution of value or enjoyment of adjacent property. Testimony to the City Council disclosed a study showing no decline in property values in neighborhoods adjacent to such facilities. Specifically, the Council was told that the Minneapolis Planning Commission conducted a national literature search on the subject and that there was no demonstration of decrease in property values in adjoining neighborhoods unless there were five facilities in a block. It was also stated that the Minneapolis Planning Commission completed a comprehensive survey on residential facilities and found that people who live next to licensed facilities saw the facilities as good neighbors. Undisputed evidence supported a trial court finding that the proposed home would not increase "zoning intensity;" the building is adjacent to a commercial (filling station) site, across the street from another commercial (post office) site, and separated by an appropriate fence from an adjacent residential area. We conclude, as did the trial judge, that the City Council finding concerning enjoyment of adjacent property is not supported by the evidence, and that the effect of this use "was not demonstrated as being greater than if the property units were occupied by the typical four families ... instead of 18 mildly mentally ill persons."

### F. Non-conforming Use

■ Northwest was also denied a permit on the basis that the proposed use would constitute an expansion of a non-conforming use. Specifically, the Brooklyn Center City Council found that "the proposed site is a non-conforming use in that there is inadequate parking available on the site

and the lot is substandard in size, and the proposed use would be an increase in intensity and expansion of such a non-conforming use." Authority for this finding is Brooklyn Center Municipal Ordinance § 35–111(1). This section prohibits expansion of non-conforming uses.

We have previously disposed of the parking issue. There is no dispute that the lot is substandard in size or that the site nonconformity predated the zoning ordinance and is a legal non-conforming use. The fact that the proposed facility would house more people than presently live in the structure does not support a conclusion that the home would be an expansion of non-conforming use. Again, the only nonconformity concerns site characteristics, not use characteristics. The municipal ordinances explicitly permit boarding homes as special uses, Brooklyn Center Municipal Ordinance, § 35–313 and allow at least eighteen people to live in the fourplex. We thus conclude, as did the trial judge, that the proposed home would not constitute an expansion of a non-conforming use. In this regard the trial judge stated, and we agree, that the effect of the proposed home "was not demonstrated as being greater than if the property units were occupied by the typical four families ... instead of 18 mildly mentally ill persons."

G. Occupancy

■ The sole reason for denial of the writ of mandamus by the trial court was its conclusion that the Brooklyn Center City Council findings that the proposed home would adequately house twelve mentally ill people was "reasonably debatable." Further, the trial court concluded that Northwest had not established by a preponderance of the evidence that the group home would not "endanger the public health or comfort of 18 proposed residents within the meaning of Section 35–220," the ordinance concerning special use permits, or that less than eighteen residents "should not be required in order to protect the health and safety of the residents within the meaning of Minn.Stat. § 245.812, subd.

4." This statutory provision prohibits municipalities from imposing special conditions on residential facilities unless the additional conditions are necessary to protect the health and safety of residents of the facility.

The specific findings of the City Council concerning occupancy limitations as a basis for denying the permit were that "(t)he facility contains adequate space for no more than 12 mentally ill persons together with support staff;" and "(t)he space needs of 18 mentally ill persons are greater than the space needs of four 'usual type' families." In addition, the City Council found that housing eighteen residents and staff members would compromise the welfare of residents; cause stress and jeopardize the goals of the facility; and would not provide a healthy, comfortable environment for residents. The special occupancy limitation was created on the basis of the opinion of Dr. Seller. Dr. Seller recommended that the facility house no more than three residents per unit.

The twelve person occupancy limitation is contrary to Brooklyn Center's own occupancy ordinances, which allow eighteen people to live at the proposed site. Brooklyn Center Municipal Ordinance § 12–803 permits one family per dwelling unit and family has been defined to allow five unrelated people in each unit, Brooklyn Center Municipal Ordinance § 12–201(6). No unit in the fourplex would house more than five residents and thus the proposed occupancy plan conforms to this standard. The occupancy plan also meets all square footage per occupant requirements under Brooklyn Center Municipal Ordinance § 12–802.

Further, the occupancy plan for Northwest Residence conforms to state of Minnesota standards regarding residential facilities for the mentally ill. Pursuant to the Public Welfare Licensing Act, Minn.Stat. § 245.781 to 245.812 (1982 and Supp.1983), the proposed facility must be licensed under Minnesota Department of Welfare "Rule 36," Minn.Rules, parts 9520.0500 to 9520.0690. Wright intends to apply for a Category II operating license under Rule

36. A Category II program is a "mental health residential program which provides either a transitional semi-independent living arrangement or a supervised group supportive living arrangement for mentally ill persons." Minn.Rules, part 9520.0510, subpart 5. Such facilities must also acquire a board and lodging license from the Minnesota Department of Health or a local agency delegated licensing authority by the Department. Minn.Rules, part 9520.0670, subpart 3.

Minnesota Rules, part 9520.0650, establish standards concerning furnishings, program space, and individual privacy in residential facilities for adult mentally ill persons. The Department of Health board and lodging standards require that one-person bedrooms contain at least seventy square feet of usable floor space, and that multi-occupant bedrooms contain not less than sixty square feet of usable floor space for each occupant, Minn.Rules, part 4625.-0900.

Evidence at trial clearly indicated that Northwest Residence would meet the state standards governing residential facilities for the mentally ill. Marjorie Wherley, a Residential Program Consultant at Hennepin County Mental Health Division responsible for monitoring purchase of service contracts at nineteen community residential facilities for mentally ill adults, testified that her Division entered into a purchase of service agreement with Northwest Residence; that the Division only enters contracts with facilities capable of meeting Rule 36 requirements; and that her Division conducted a floor area analysis of the proposed facility and concluded that it met the living space needs for eighteen residents. The smaller bedrooms in the fourplex do have a three square foot deficiency under Department of Health board and lodging standards. Wherley testified, however, that if a room has a minor space deficiency, a waiver from the Department of Health may be obtained.

We do not, however, evaluate the special occupancy limitation based on the usual reasonableness standard for reviewing municipal zoning decisions. Northwest Residence met all municipal occupancy requirements and we hold that state law has preempted local authority in the area of ensuring an appropriate living environment in residential facilities for the mentally ill.

The Minnesota Supreme Court has looked to the following factors in determining whether the state has preempted a field of legislation:

(1) What is the "subject matter" which is to be regulated?

(2) Has the subject matter been so fully covered by state law as to have become a matter solely of state concern?

(3) Has the legislature in partially regulating the subject matter indicated that it is a matter solely of state concern?

(4) Is the subject matter itself of such a nature that local regulation would have unreasonably adverse effects upon the general populace of the state?

*Mangold Midwest Co. v. Village of Richfield,* 274 Minn. 347, 358, 143 N.W.2d 813, 820 (Minn.1966). Each of the *Mangold* factors has been met in this instance.

First, the subject matter to be regulated is the physical environment and care provided by residential facilities for the mentally ill. Care, treatment, and deinstitutionalization of mentally ill adults has been a matter of special state concern. This state policy is evidenced by a host of legislation.

Minn.Stat. §§ 245.781 to 245.812 (1982 and Supp.1983), the Public Welfare Licensing Act, was passed to regulate provision of services and assure proper care for a number of groups, including mentally ill adults. The vehicle for assuring such care is the licensure of residential facilities. Pursuant to the Licensing Act, the Commissioner of Public Welfare has promulgated comprehensive regulations governing residential facilities for the mentally ill, Minn.Rules, parts 9520.0500 to 9520.0690. These regulations establish the program services that must be offered by residential facilities, as well as living unit, individual privacy, and staff requirements.

State concern for deinstitutionalization is also evidenced by the Minnesota Commitment Act of 1982. This Act recognizes a right to treatment in the least restrictive setting; if there is no alternative to commitment, courts must "commit the patient to the least restrictive treatment facility which can meet the patient's treatment needs ..." Minn.Stat. § 253B.09 (1982).

Regarding the second and third *Mangold* factors, the state has regulated the operation of residential facilities for the mentally ill to an extent that the matter has become one of sole state concern. The Legislature sanctioned state standards in the Licensing Act. The Commissioner of Public Welfare has promulgated extensive regulations to ensure an appropriate environment and services in residential facilities for the mentally ill. The Commissioner has engaged staff to implement these regulations and to give continued attention to this field.

Special provisions of the Licensing Act evidence that Minnesota has made residential facilities a matter of state concern in that municipalities are prohibited from imposing more restrictive conditions on such facilities than are imposed on other special uses unless the additional conditions are necessary to protect the health and safety of facility residents. Minn.Stat. § 245.812 (1982). As the Minnesota Supreme Court stated in *Costley v. Caromin House, Inc.*, 313 N.W.2d 21, 27 (Minn.1981), "Minnesota is one of an increasing number of states that have enacted legislation designed to facilitate acceptance of group homes in residential communities." (footnote omitted) In addition, the Attorney General argues, convincingly, that local action is precluded by the statutory (Minn.Stat. § 144.653, subds. 1 and 3 (1982)) grant of "exclusive" authority to the Commissioner of Public Health to set license standards for "Category I" facilities. Public action to benefit patients, such as that proposed by Brooklyn Center, is in the area of authority of the Commissioner of Public Health whenever the action expands on the protection accorded patients in Category II (Rule 36) group homes.

Turning to the fourth *Mangold* factor, local regulation of residential facilities for the mentally ill would have unreasonably adverse effects upon the general populace of the state. There is no doubt that municipalities can require residential facilities to meet the general occupancy, health, and safety standards applicable to land uses in the community. If, however, municipalities were permitted to establish special standards for the operation of residential facilities for the mentally ill, in this case stricter occupancy standards than are required under its own ordinances or state regulations, municipalities could effectively bar establishment of such facilities or make them economically infeasible. This result would be contrary to the state policy in favor of residential treatment. In addition, continuing state oversight of such facilities would guard against overcrowding or other substandard conditions.

We thus conclude that Northwest Residence meets all applicable occupancy requirements. Brooklyn Center Municipal Ordinances permit eighteen people to reside in this fourplex, and the City lacked authority to establish a stricter occupancy standard for mentally ill adults since special care of the mentally ill has been made a matter of state concern and the state has preempted local regulation in this field.

■ Even though Minn.Stat. § 245.812 (1982) permits municipalities to impose special conditions on residential facilities if the additional conditions are necessary to protect the health and safety of facility residents, this provision constitutes a narrow grant of authority and cannot be interpreted in a manner that would run against state regulations on the operation of residential facilities, or undermine the state policy of favoring the establishment of community residential facilities. Rather, it must be read to permit municipalities to impose only special health and safety standards appropriate to the characteristics of a particular site. This type of condition is at the heart of municipal land use regulation. See Minn.Stat. § 462.351 and § 462.-357(1) (1982). The grant of authority does

not permit municipalities to establish special regulations concerning the general welfare of mentally ill adults and thus is not a basis for a special occupancy requirement.

Even if Brooklyn Center had the power to impose a special occupancy standard for a residential facility for mentally ill adults, the City's exercise of power would conflict with state law. The state would clearly permit the facility to house eighteen residents and local regulation that forbids what the state expressly permits cannot stand. *Duffy v. Martin,* 265 Minn. 248, 252, 121 N.W.2d 343, 346 (Minn.1963).

**DECISION**

Northwest Residence, Inc. meets all lawful standards for issuance of a special use permit under Brooklyn Center municipal ordinances and is therefore entitled to a writ of mandamus compelling the City Council to issue a special use permit.

We reverse the trial court and remand for entry of judgment directing issuance of a peremptory writ of mandamus.