**Mitchell SAWH, Relator,**

v.

**CITY OF LINO LAKES, Respondent.**

**No. A10–2143.**

Court of Appeals of Minnesota.

July 25, 2011.

Marshall H. Tanick, Teresa J. Ayling, Mansfield, Tanick & Cohen P.A., Minneapolis, MN, for relator.

Patricia Y. Beety, James J. Monge, League of Minnesota Cities, St. Paul, MN, for respondent.

Considered and decided by SCHELLHAS, Presiding Judge; MINGE, Judge; and HUDSON, Judge.

## OPINION

SCHELLHAS, Judge.

Relator challenges the City of Lino Lakes City Council's order for the destruction of his dog after its declaration as a dangerous animal under the Lino Lakes Code of Ordinances. Because the city's declaration of the dog as a dangerous animal is predicated on the dog's earlier declaration as a potentially dangerous animal, which the city's ordinance provided no

meaningful opportunity to challenge, the city's ordinance violates relator's due-process rights, and we reverse.

## FACTS

Relator Mitchell Sawh is a resident of the City of Lino Lakes. He and his family own a mixed-breed dog, Brody. On April 8, 2010, when Brody was two years old, he broke through his invisible fence and injured a man walking near relator's house. The record is unclear about whether Brody scratched or bit the pedestrian, but it is undisputed that Brody injured the pedestrian when he jumped up on him. As a result of this incident, the Lino Lakes Police Department notified relator in writing that Brody had been classified as a "potentially dangerous animal," as defined by the city ordinance. The notification also informed relator that if Brody "aggressively bites, attacks or endangers the safety of humans or domestic animals in the future [the police] will have the authority to deem [the] dog dangerous and also have the authority to order destruction." Neither the written notification nor the ordinance provided relator a meaningful opportunity to challenge the potentially dangerous-animal declaration.

On October 15, 2010, relator's wife, Andra Sawh, was grooming Brody on the front stoop in their yard. Brody was wearing a collar and was tethered to a tree on a long leash. A woman walked through the yard, motioning with her arms as she talked on her cell phone to a 911 operator. The woman was trying to ascertain the cause of smoke that she observed near a home in proximity to relator's. Brody approached the woman and bit her in the right elbow, pulling off her jacket. Ms. Sawh returned Brody to the front stoop and returned the woman's jacket to her. "[A]ll of a sudden the dog started coming at [the woman] again" and bit her again in the left hip while she was standing at the bottom of relator's driveway.

After the October 15 incident, the Lino Lakes Police Department sent an undated written notification to Ms. Sawh, stating: "Due to incidents that occurred on 04/08/2010 and 10/15/2010, your dog has been classified as a 'dangerous animal' per Lino Lakes [Code of] Ordinance[s § ] 503.15. As a result of this classification you are to have your dog permanently removed from the city within 14 days." The notification also stated:

> If you wish to appeal the "dangerous animal" classification, you must contact the Lino Lakes City Hall by November 3 at 4:30 pm to schedule a hearing before the city council. Failure to take any action within the given 14 day period will result in the immediate seizure and destruction of your dog at your expense.

The notification also informed Ms. Sawh that a citation was attached "for the dog bite that occurred on 10/15/2010."

On October 29, 2010, the Lino Lakes city clerk sent Ms. Sawh a letter notifying her that, under Lino Lakes Code of Ordinances § 503.15, she was "allowed to request a hearing before the City Council to *review the dangerous animal determination.*" (Emphasis added.) The letter also notified Ms. Sawh that, based on the request of relator, a hearing before the Lino Lakes City Council on November 8 at 6:30 p.m. had been scheduled. The letter also addressed the citation [1] previously sent.

---

1. Lino Lakes Code of Ordinances § 503.15(1) states, "It shall be unlawful for any person's animal to inflict or attempt to inflict bodily injury to any person or other animal whether or not the owner is present. This section shall not apply to an attack ... upon an uninvited intruder who has entered the owner's home with criminal intent."

In regard to the citation that was issued by the animal control officer for the bite that occurred on October 15, 2010, that is a separate process and you are required to follow through with Anoka County on that matter.

Relator attended the public hearing to "review the dangerous animal determination" on November 8. The woman bitten by Brody on October 15 testified at the hearing that the smoke and her nervousness may have possibly aggravated the dog, but that she had done nothing to purposely aggravate the dog and she felt that "the dog absolutely was not under the owner's control." The woman stated that even though she had to have the bite on her arm medically treated, she was "not that concerned about [it]," but was concerned about what might have happened had she been an elderly person or a child. Ms. Sawh also testified, saying that she lost control of Brody when he bit the woman on October 15.

As summarized by the Lino Lakes Police Department in a letter, dated November 10, 2010, "[t]he outcome of the hearing was that the dog was declared a dangerous dog and it could stay at your house but you must meet the criteria set out by the council that evening." Among the criteria intended to protect the public was the requirement that Brody be muzzled whenever he is outside a proper enclosure.

On November 9, the day after the city council declared Brody a dangerous dog and ordered that relator take precautions to protect the public, and before relator or Ms. Sawh received the written notice from the police department and city, Brody bit a furniture delivery man in the Sawh home. Ms. Sawh was present to receive the delivery and had put Brody in the basement in his kennel but the door to the kennel remained open. Ms. Sawh asked the delivery man to enter the upstairs but, instead, without notice to her, he went into the basement to see where the furniture would be placed. Ms. Sawh had not warned the man about Brody's presence in the basement, and relator had not yet posted notices that a declared dangerous dog was on the premises. When the delivery man entered the basement, Brody came out of his kennel and bit him on the left hand, leaving two puncture wounds.

In the November 10 letter, the Lino Lakes Police Department informed relator that Brody's bite of the man on November 9 was "considered a subsequent bite per the city ordinance (503.16(4)) and thus the animal was seized and is currently being held at the designated facility. Per [this] ordinance this dog is to be destroyed in a proper and humane manner and you as the owner shall pay the cost of confining the animal." The letter also informed relator that he had 14 days to appeal the order by contacting the Lino Lakes city clerk.

Relator appealed the order and attended another public hearing before the city council on November 22. At the public hearing, relator introduced a letter from the delivery man stating that the dog bit him but that he hoped the dog would not have to be destroyed. Relator also introduced several letters and e-mails from friends in support of the dog. Many of the letters state that the dog is friendly and frequently in situations, e.g., softball games, where there are children and other dogs around without any observed incidents. Relator also introduced testimony from an animal behaviorist, Carol Propotnik, who had worked for more than 15 years in Minnesota and more than 5 years in the United Kingdom. Ms. Propotnik spent time with Brody during his confinement and found him to display "protective behavior" for which she recommended training. Ms. Propotnik noted that Brody could still be trained even though he was

no longer a puppy, it would just likely take longer. She also opined that each of Brody's bites occurred when he was defending his territory, that he was not unduly aggressive, and was not a dangerous dog.

Following the public hearing, the city unanimously adopted the following findings:

Following a public hearing on November 8, 2010 at the owner's request, the council confirmed the police department's finding that the dog, Brody, is deemed to be dangerous as that term is defined by city ordinance and state law. The following day, an individual ... was invited into the [Sawhs'] home for the purpose of delivering furniture ... [and] was bitten on the left hand by the dog, Brody. There is no evidence of provocation by [the delivery man] prior to the bite.... The bite on November 9, 2010 constitutes a violation of city ordinance 503.15 and constitutes a subsequent offense under 503.16, paragraph 4.

By writ of certiorari, relator appeals the city's decisions of November 8 and November 22, 2010.

## ISSUE

Was relator denied procedural due process when the city declared his dog a dangerous animal predicated on its earlier declaration of the dog as a potentially dangerous animal for which relator was afforded no meaningful opportunity to challenge the declaration?

## ANALYSIS

■ "City council action is quasi-judicial and subject to certiorari review if it is the product or result of discretionary investigation, consideration, and evaluation of evidentiary facts." *Staeheli v. City of St. Paul*, 732 N.W.2d 298, 303 (Minn.App. 2007) (quotation omitted). A certiorari review of the merits of a quasi-judicial deci-

sion is limited to "whether the order or determination in a particular case was arbitrary, oppressive, unreasonable, fraudulent, under an erroneous theory of law, or without any evidence to support it." *Dietz v. Dodge Cnty.*, 487 N.W.2d 237, 239 (Minn.1992) (quotation omitted). A court of review will not retry facts and will uphold the agency's decision "if the lower tribunal furnished any legal and substantial basis for the action taken." *Staeheli*, 732 N.W.2d at 303 (quotation omitted).

■ The city argues that the issue of procedural due process is not properly before this court because relator never raised the issue below. But constitutional issues are within the exclusive province of the judicial branch, and administrative agencies generally do not have jurisdiction to resolve constitutional issues. No requirement exists that such issues be raised to the agency before they may be heard on appeal. *See Neeland v. Clearwater Mem'l Hosp.*, 257 N.W.2d 366, 368–69 (Minn. 1977). Relator properly raised the issue of a constitutional-due-process violation to this court on appeal, and we will consider it. Whether procedural due-process rights have been violated is a question of law, which this court considers de novo. *Plocher v. Comm'r of Pub. Safety*, 681 N.W.2d 698, 702 (Minn.App.2004).

■ Relator argues that the city deprived him of his due-process rights when it declared his dog "potentially dangerous" without providing him with a hearing or other opportunity to appeal this declaration, and then subsequently relied on the declaration to determine that his dog is "dangerous" under the Lino Lakes Code of Ordinances. The right to due process is guaranteed by both the United States and Minnesota Constitutions. U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 7. "The threshold requirement of any due-

process claim is that the government has deprived a person of a constitutionally protected liberty or property interest...." *Nexus v. Swift,* 785 N.W.2d 771, 779 (Minn.App.2010). If this requirement is met, procedural due process guarantees reasonable notice and a meaningful opportunity to be heard. *Id.* Procedural due process "is flexible and calls for such procedural protections as the particular situation demands." *Brooks v. Comm'r of Pub. Safety,* 584 N.W.2d 15, 19 (Minn.App.1998) (quotation omitted), *review denied* (Minn. Nov. 24, 1998).

In *Am. Dog Owners Assoc., Inc. v. City of Minneapolis,* 453 N.W.2d 69, 71 (Minn. App.1990), this court adopted the three factors articulated by the U.S. Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), to determine what process is due once a protected interest is established. The three factors are (1) "the private interest ... affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903.

### Private Interest Affected

■ We first consider the private interest that will be affected by the action. *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903. Dogs are personal property under Minnesota law. *Corn v. Sheppard,* 179 Minn. 490, 492, 229 N.W. 869, 870 (1930). We therefore conclude that a protected property interest is implicated and proceed to apply the *Mathews* balancing test. But, in *American Dog Owners,* we determined

that "[p]rivate parties have little interest in harboring animals that may be dangerous" and that "[t]he city has a high interest in taking appropriate measures for animal control." 453 N.W.2d at 71–72. Relator does not challenge the city's interest in identifying dangerous dogs. With respect to dangerous dogs, this factor weighs in favor of the city.

### Risk of Erroneous Deprivation of Property Interest

We next consider the risk, if any, of an erroneous deprivation of relator's property and the probable value of additional safeguards. *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903. Relator argues that there is a significant risk of erroneous deprivation because he was not provided with an opportunity to challenge the declaration of his dog as "potentially dangerous." We agree.

The city argues that designating the dog as "potentially dangerous" did not risk the erroneous deprivation of relator's property interest because it did not result in seizure or destruction of the dog and merely put relator on notice that the dog was a potentially dangerous animal. *See* Lino Lakes, Minn., Code of Ordinances § 503.15(4) (2010). But the potentially dangerous declaration did more than merely put relator on notice. Under the city code, a potentially dangerous declaration can provide a basis on which the city later deems a dog "dangerous." Lino Lakes, Minn., Code of Ordinances § 503.15(3)(a) (2010) defines a "dangerous animal" as an animal which has:

1. Caused bodily injury or disfigurement to any person on public or private property;

2. Engaged in any attack on any person under circumstances which would indicate danger to personal safety;

3. Exhibited unusually aggressive behavior, such as an attack on another animal;

4. Bitten one or more persons on two or more occasions; or

5. *Been found to be potentially dangerous* and/or the owner has personal knowledge of the same, [sic] the animal aggressively bites, attacks or endangers the safety of humans or domestic animals.

(Emphasis added.)

Although the city did not make specific findings after the hearing on November 8, 2010, based on our review of the record, we conclude that the city deemed relator's dog "dangerous" because the dog had already been declared "potentially dangerous" and subsequently bit a person.

 The city also argues that the November 8 hearing, at which relator was afforded an opportunity to his challenge the "dangerous declaration," was enough to satisfy relator's due-process rights. We disagree. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Kleven v. Comm'r of Pub. Safety*, 399 N.W.2d 153, 156 (Minn.App. 1987) (quotation omitted).

The record reflects that the city never notified relator that he could challenge the "potentially dangerous" declaration at the November 8 hearing. And, although relator presented testimony regarding the first incident on April 8, 2010, which led to the potentially dangerous declaration, the record shows that the city council did not review the potentially dangerous declaration but, rather, acted as though that declaration was not up for debate. At the November 8 hearing, the city attorney stated, "the first step is ... to determine whether the dog is declared dangerous," without mentioning the potentially danger-

ous declaration. The chief of police also stated that after the first incident, "the dog was at that point listed as potentially dangerous. So it reached that first threshold. It's not the first bite here that takes it to that dangerous level, so we're onto that next bite already.... [T]hat's what put us at the dangerous level." The ensuing discussion at the hearing focused on whether to designate the dog as dangerous. Nothing in the record suggests that the city or relator approached the hearing on November 8 with an understanding that the potentially dangerous declaration was before the city for review or reconsideration.

Due process requires that a party have an opportunity to be heard at a meaningful time. *See id.* Even if the city council would have reviewed the April 2010 potentially dangerous declaration of Brody at the November 8 hearing, we question whether the review would have been timely. But we need not decide that issue.

Providing relator with the additional safeguard of a hearing or other appeal opportunity after the potentially dangerous declaration would have given the city council a better opportunity to specifically consider the incident that resulted in the potentially dangerous declaration. Under Lino Lakes Code of Ordinances § 503.15(3)(b) (2010), an animal may obtain a "potentially dangerous animal" declaration for reasons other than those that lead to a "dangerous declaration." An animal is declared "potentially dangerous" if it has:

1. Bitten a human or a domestic animal on public or private property;

2. When unprovoked, chased or approached a person upon the streets, sidewalks, or any public property in an apparent attitude of attack; or

3. Has engaged in unprovoked attacks causing injury or otherwise threat-

ening the safety of humans or domestic animals.

Lino Lakes, Minn., Code of Ordinances § 503.15(3)(b). This declaration is significant because it can be used as a predicate for a dangerous-animal declaration. And once a dog is declared dangerous, the city may place substantial restrictions on the dog and its owners or may decide to destroy the dog. *See* Lino Lakes, Minn., Code of Ordinances §§ 503.15, subd. 7(a)(1), (2), 503.16(1) (2010). Because a significant risk of erroneous deprivation of relator's property exists and additional safeguards would be beneficial, this *Mathews* factor weighs in favor of relator.

### *Government Interest*

We next consider the government's interest, including the fiscal and administrative burdens that the additional procedural requirements would involve. *Mathews*, 424 U.S. at 335, 96 S.Ct. at 903. In *American Dog Owners*, we stated that a city "has a high interest in taking appropriate measures for animal control." 453 N.W.2d at 72. But, notably, other municipalities in the state provide some sort of review after the city designates a dog "potentially dangerous." *See* Golden Valley, Minn., Code of Ordinances § 10.30, subd. 7(I)(2)(b), (3) (2010) (requiring city to provide notice of right to appeal and appeal hearing before an impartial hearing officer to contest potentially dangerous declaration); Plymouth, Minn., Code of Ordinances § 915.25, subd. 2 (2010) (requiring the city to provide dog owner notice that dog has been declared potentially dangerous dog and rights to a hearing on the matter); Minneapolis, Minn., Code of Ordinances (MCO) § 64.110, subd. f(1) (2010) (allowing owner of potentially dangerous dog to contest declaration through written evidence or affidavits); Saint Paul, Minn., Code of Ordinances (SPCO) § 200.11(b) (2010) (requiring the city to provide 14 days for dog owner to appeal potentially dangerous-dog determination or imposition of conditions). Municipalities have also found ways to keep the fiscal and administrative burden for such an appeal low. *See* MCO § 64.110, subd. f(1) (requiring the dog owner to pay an administrative fee of $100 when requesting a review hearing); SPCO § 200.11(b) (requiring the dog owner to pay an administrative fee of $50 when requesting a review hearing). Therefore, this factor also weighs in favor of relator.

Because two of the three *Mathews* factors weigh in favor of relator, we conclude that his procedural due-process rights were violated, and accordingly, we reverse. *See Am. Dog Owners*, 453 N.W.2d at 71–72 (concluding that a procedural-due-process challenge fails where none of the *Mathews* factors weighs in favor of the party making the challenge). We hold that when a city relies on the potentially dangerous declaration as a predicate for a dangerous-animal declaration, as it did in this case, the dog owner must be afforded a meaningful opportunity to challenge the potentially dangerous declaration in order for the city to satisfy the dog owner's right to procedural due process. This issue is dispositive of the matter, and we decline to address the other issues raised on appeal. *See generally Dep't of Highways v. O'Connor*, 289 Minn. 243, 246, 183 N.W.2d 574, 576 (1971) (court declined to address second issue where court's decision on the first issue was dispositive).

### DECISION

The city's declaration of relator's dog as a dangerous animal and its order to destroy the dog are reversed.

**Reversed.**