Mitchell SAWH, Respondent/Cross–
Appellant,

v.

CITY OF LINO LAKES,
Appellant/Cross–
Respondent.

No. A10–2143.

Supreme Court of Minnesota.

Dec. 19, 2012.

Marshall H. Tanick, Teresa J. Ayling, Hellmuth & Johnson PLLC, Edina, MN, for respondent.

Patricia Y. Beety, James J. Mongé III, League of Minnesota Cities, Saint Paul, MN, for appellant.

## OPINION

STRAS, Justice.

This appeal arises out of three biting incidents involving a dog owned by re-

spondent Mitchell Sawh. After the first bite, appellant City of Lino Lakes ("the City") designated Sawh's dog as "potentially dangerous." After the second bite, the City designated the dog as "dangerous." And after the third bite, the City ordered the dog's destruction. Sawh appealed the City's decisions by writ of certiorari. The court of appeals reversed the City's decisions, holding that Sawh's inability to challenge the "potentially dangerous" designation violated his right to procedural due process. *Sawh v. City of Lino Lakes*, 800 N.W.2d 663, 670 (Minn. App.2011). Because we conclude that Sawh was not constitutionally entitled to a hearing to challenge the "potentially dangerous" designation, and substantial evidence supports the City's decisions, we reverse the decision of the court of appeals.

## I.

This case is about a dog named Brody. Respondent Mitchell Sawh owns Brody, a dog that was involved in three biting incidents. The first incident took place on April 8, 2010, when Brody injured C.S., who was walking near Sawh's home. C.S. told the police that Brody "ran at him barking aggressively" and "jumped up and bit his left arm." Sergeant Kyle Leibel saw C.S.'s injury and described it as "a fairly large series of bloody scratches" that "appeared consistent with a dog's teeth." Because of the incident, Community Service Officer Kristen Wills determined that Brody should be designated as "potentially dangerous" under Lino Lakes, Minn., Code of Ordinances § 503.15 (2011) (all references herein to the Lino Lakes City Code of Ordinances predate the substantive amendments that the City passed on October 10, 2011). Wills sent Sawh's son a letter advising him of her decision and warning him that a future bite or attack by Brody could lead the City to designate

Brody as "dangerous" and possibly to order the dog's destruction. However, the City's designation of Brody as "potentially dangerous" did not result in any restrictions or limitations on Sawh's possession or enjoyment of Brody.

On October 15, 2010, approximately six months after the first incident, a second biting incident occurred. Sawh's wife was grooming Brody on the front patio of their home when D.I. crossed Sawh's yard to investigate a pile of burning leaves on a neighboring property. As D.I. walked back toward the street, Sawh's wife approached D.I. to ask about the fire. Once Sawh's wife and D.I. began chatting about the fire, Brody bit D.I. on the arm and pulled off her jacket. When Sawh's wife attempted to place Brody on the front stoop and return D.I.'s jacket, Brody bit D.I. a second time—this time on her hip. The doctor who treated D.I.'s wounds stated before the Lino Lakes City Council ("the City Council") that the bite on D.I.'s elbow "went through every layer of the skin." Officer Wills, who responded to the incident, designated Brody as "dangerous." The notification to Sawh stated that "due to incidents that occurred on 04/08/2010 and 10/15/2010," the City had designated Brody as a "dangerous animal," which meant that the Sawhs had 14 days to remove Brody from the City. The letter further stated that, if Sawh wished to appeal the City's "dangerous animal" designation, he could schedule a hearing before the City Council.

Sawh timely requested a hearing before the City Council. At the hearing, Officer Wills described the April 8 and October 15 events to the City Council members, and Police Chief Kent Strege presented photographs of the injuries suffered by C.S. and D.I. D.I. also presented her account of the October 15 incident. Finally, Sawh, his wife, and his son each had an opportu-

nity to speak. The Sawhs argued that the April injury was a scratch, not a bite, and that D.I. had provoked the October incident. The Sawhs also argued that Brody was a friendly dog who was not dangerous or aggressive.

Although the parties presented facts about the April incident, the City Council did not formally review the designation of Brody as "potentially dangerous." Rather, based on the April incident, Chief Strege informed the City Council that Brody had already "reached that first threshold." The City Council then unanimously voted to sustain Brody's designation as a "dangerous" animal. Instead of requiring Brody's destruction or permanent removal from the City, however, the City Council permitted Sawh to maintain possession of Brody if Sawh complied with a series of conditions, such as providing notice to the public that Brody is dangerous, keeping Brody enclosed or muzzled at all times, and maintaining $300,000 in liability insurance.

On November 9, 2010, the day after the hearing, a third incident involving Brody occurred. When the Sawhs were having furniture delivered to their home, the deliveryman, C.H., walked into the Sawhs' basement to view the potential location for a sofa when Brody bit C.H. once on his left hand. The police subsequently seized Brody and impounded him. The next day, Chief Strege sent Sawh a letter notifying him that the third incident constituted a "subsequent bite" under a City ordinance, requiring the City to destroy Brody.

Sawh again appealed, resulting in a second hearing before the City Council. At the hearing, the Sawhs presented numerous testimonials from friends and an animal behavior expert, all of whom stated that Brody was not aggressive or danger-

ous. Sawh also argued that he would take all necessary steps to ensure that Brody received proper training so that he would not pose a threat to others. Chief Strege informed the City Council that an animal control officer *must* order the destruction of the dog upon a finding of a subsequent violation of the City Code. After reviewing the police report of the third incident and a photograph of C.H.'s hand, the City Council found that Brody bit C.H. without provocation. The City Council also determined that the third incident constituted a "subsequent offense" under the City Code, requiring Brody's destruction.[1]

Sawh sought review by writ of certiorari, and the court of appeals reversed. *Sawh*, 800 N.W.2d at 664, 670. The court concluded that Sawh's inability to challenge the designation of Brody as "potentially dangerous" after the first incident violated Sawh's right to procedural due process. *See id.* at 668–70. The court rejected the City's argument that the two hearings—the first after Officer Wills designated Brody as "dangerous" and the second after the incident involving the deliveryman—provided adequate due process to Sawh. *Id.* at 669. Rather, the court held that, when a city relies on a "potentially dangerous" designation as the predicate for a subsequent finding that an animal is "dangerous," due process requires a meaningful opportunity for the animal's owner to challenge the "potentially dangerous" designation. *Id.* at 670. Because the City deprived Sawh of such an opportunity in this case, the court reversed both the City's designation of Brody as "dangerous" and the order to destroy the dog. *Id.*

We granted the City's petition for further review. We also granted Sawh's peti-

1. The City's order for destruction has been   stayed pending appeal.

tion for cross-review, which challenges the City's decisions on their merits.

## II.

The first question presented by this case is whether the City violated Sawh's right to procedural due process. Whether the government has violated a person's procedural due process rights is a question of law that we review de novo. *See Carrillo v. Fabian,* 701 N.W.2d 763, 768 (Minn.2005). We conduct a two-step analysis to determine whether the government has violated an individual's procedural due process rights. *Id.* at 768; *see also Ky. Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). First, we must identify whether the government has deprived the individual of a protected life, liberty, or property interest. *Carrillo,* 701 N.W.2d at 768. If the government's action does not deprive an individual of such an interest, then no process is due. *See Bd. of Regents v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). On the other hand, if the government's action deprives an individual of a protected interest, then the second step requires us to determine "whether the procedures followed by the [government] were constitutionally sufficient." *Swarthout v. Cooke,* —— U.S. ——, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011). To determine the constitutional adequacy of specific procedures, the Supreme Court of the United States established a three-factor balancing test in *Mathews v. Eldridge,* which requires us to consider:

[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative bur-

dens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Put differently, if a protected life, liberty, or property interest is at stake, we must weigh the *Mathews* factors to determine what type of process is constitutionally due to a person deprived of such an interest. *Id.* The procedures afforded by the government must provide an individual with notice and an "opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 333, 96 S.Ct. 893 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)).

## A.

The first step in the analysis is to determine whether the City deprived Sawh of a protected life, liberty, or property interest. We have long held that dogs are personal property under Minnesota law, which means that any governmental deprivation of Sawh's property interest in Brody implicated Sawh's procedural due process rights. *See Corn v. Sheppard,* 179 Minn. 490, 492, 229 N.W. 869, 870 (1930) (noting that dogs are personal property). When the City designated Brody as "potentially dangerous," however, it did not deprive Sawh of anything, much less a protected property interest. As Sawh himself acknowledges, the "potentially dangerous" designation did not adversely affect his possession or ownership of Brody in any way. Instead, the only consequence of the "potentially dangerous" designation was that the City was required to provide Sawh with written notice of the designation—an obligation that the City indisputably fulfilled. *See* Lino Lakes, Minn., Code of Ordinances § 503.15(4).

Sawh nonetheless argues that the City was required to provide him with an

opportunity to challenge the "potentially dangerous" designation because it served as a predicate for the City's eventual order to destroy Brody. Sawh's argument, however, improperly bypasses the first step of the procedural due process analysis, which requires the government to provide constitutionally sufficient process only when the government has the ability to deprive an individual of a protected interest. Indeed, procedural due process protections do not apply when government action *may* lead to the deprivation of a protected interest at some indeterminate point in the future based on certain unfulfilled conditions. *See Roth,* 408 U.S. at 569, 92 S.Ct. 2701 ("The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."); *State, Dep't of Pub. Safety v. Elk River Ready Mix Co.,* 430 N.W.2d 261, 264 (Minn.App.1988) (holding that due process did not require the defendant to receive notice that overweight vehicle violations could subject him to civil liability because there was no deprivation of property). Because the "potentially dangerous" designation did not, and could not, result in any restrictions on Sawh's possession or enjoyment of Brody, the court of appeals erred when it held that the City violated Sawh's procedural due process rights when it did not afford Sawh an opportunity to contemporaneously appeal or otherwise challenge the City's designation of Brody as "potentially dangerous."

■ Sawh accurately observes, however, that once Officer Wills designated Brody as "dangerous" on October 15, he *was* subject to a deprivation of his property interest in Brody. At that time, the City had the authority either to destroy Brody or to impose restrictions on Sawh's ownership of Brody, such as requiring Sawh to keep Brody in an enclosure or muzzled, to annually certify proof of liability insurance in an amount equal to at least $300,000, and to post "clearly visible warning signs" around Sawh's home. *See* Lino Lakes, Minn., Code of Ordinances §§ 503.15(7)(a), 503.16(1) (2011). Either way, the designation of Brody as "dangerous" subjected Sawh to a potential deprivation of his protected property interest in Brody, entitling Sawh to notice and a meaningful opportunity to be heard under the Supreme Court's procedural due process jurisprudence. *See Mathews,* 424 U.S. at 333, 96 S.Ct. 893. Once Sawh's property interest in Brody was at stake, the City provided Sawh two hearings—one to challenge the City's "dangerous" designation, and a second to challenge the City's decision to destroy Brody. Whether the City's process was constitutionally sufficient, however, depends on our weighing of the three *Mathews* factors.

## B.

■ The second step in the procedural due process analysis is to determine whether the City's process was constitutionally sufficient under the three-factor balancing test from *Mathews.* The first *Mathews* factor is the private interest at stake. *See Mathews,* 424 U.S. at 335, 96 S.Ct. 893. Under Minnesota law, a dog is an item of personal property, and the loss of a dog is measured by its fair market value. *See, e.g., Smith v. St. Paul City Ry. Co.,* 79 Minn. 254, 256, 82 N.W. 577, 578 (1900); *see also Harrow v. St. Paul & Duluth R.R. Co.,* 43 Minn. 71, 72, 44 N.W. 881, 881 (1890) (setting fair market value as the proper measure of damages for the death of a horse). Thus, while animal owners have considerable sentimental attachment to their pets, Minnesota law treats an animal like any other item of tangible personal property. *See Corn,* 179 Minn. at 492, 229 N.W. at 870. Given that treatment, Sawh's protected property in-

terest at stake in this case is not nearly as substantial as the property interests that we have recognized in other contexts.[2] *See Nicchia v. New York,* 254 U.S. 228, 230, 41 S.Ct. 103, 65 L.Ed. 235 (1920) (stating that a property interest in an animal is of an "imperfect or qualified nature and [the animal] may be subjected to peculiar and drastic police regulations by the state"); *see also, e.g., C.O. v. Doe,* 757 N.W.2d 343, 350 (Minn.2008) (recognizing that a child's biological parent has a protected property interest in a contract entitling him to continued contact with his child); *Falgren v. State Bd. of Teaching,* 545 N.W.2d 901, 909 (Minn.1996) (analyzing the denial of a license necessary to one's livelihood).

The second *Mathews* factor is the risk of an erroneous deprivation of a protected interest under current procedures and the probable value, if any, of additional safeguards. *See Mathews,* 424 U.S. at 335, 96 S.Ct. 893. Officer Wills sent a letter to Sawh following the second incident advising him that she had declared Brody "dangerous." The letter informed Sawh that he had a right to appeal the decision to the City Council. The City followed a similar procedure following the third incident. At Sawh's request, the City Council held hearings following the second and third incidents. At both hearings, the City Council permitted Sawh to present witnesses, to explain his version of the incidents, and to argue that the City's decisions were inconsistent with the evidence. Courts, including our own, have held that hearings of the nature conducted here are consistent with the requirements of due process, even when similar or weightier interests are at stake. *See, e.g., Barton Contracting Co. v. City of Afton,* 268 N.W.2d 712, 716 (Minn.1978) (stating that quasi-judicial proceedings regarding a special-use permit for property "do not invoke the full panoply of procedures required in regular judicial proceedings"); *see also Goss v. Lopez,* 419 U.S. 565, 581, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (approving of an informal hearing to review a decision to discipline a student); *Ikpeazu v. Univ. of Nebraska,* 775 F.2d 250, 254 (8th Cir.1985) (holding that an informal hearing for a student to contest his dismissal from a university academic program was sufficient to comply with procedural due process requirements).

Sawh largely does not contest the adequacy of the hearings before the City Council other than to argue that he did not receive a meaningful opportunity to contest the "potentially dangerous" designation at any point, which in his view led to a serious risk that the City erroneously deprived him of his property interest in Brody. Even aside from the fact that the "potentially dangerous" designation did not result in any deprivation of Sawh's property interest in Brody, *see supra* Part II.A., Sawh's argument is inconsistent with the nature of the "potentially dangerous" animal designation under the City Code. To uphold the designation of an animal as "dangerous," the City must find only that an animal control officer has previously declared an animal "potentially dangerous" and provided written notice of that fact to the owner, not that the "potentially dangerous" designation was correct. *See* Lino

---

**2.** In analyzing the first *Mathews* factor, the court of appeals concluded that private parties " 'have little interest in harboring animals that may be dangerous' " and that the City's interest in identifying dangerous dogs outweighs the property interest of the owner. *Sawh,* 800 N.W.2d at 668 (quoting *Am. Dog*

*Owners Ass'n, Inc. v. City of Minneapolis,* 453 N.W.2d 69, 71–72 (Minn.App.1990)). The court of appeals' conclusions, however, are beyond the scope of the first *Mathews* factor, which examines only the nature of the private property interest at stake, not the interests of the government or other third parties.

Lakes, Minn., Code of Ordinances § 503.15(5)(b) (permitting an animal control officer to declare a dog "dangerous" if "[t]he animal has been declared potentially dangerous"). In other words, the purpose of the "potentially dangerous" designation is simply to put owners on notice of their animal's dangerous tendencies. *See id.* § 503.15(4) (providing for written notification to the owner upon designation of an animal as "potentially dangerous"). Accordingly, because the City Code requires only the *existence* of a "potentially dangerous" designation to declare an animal "dangerous," the City was not required to provide Sawh with an opportunity to challenge the *correctness* of that designation at a later hearing.

The third *Mathews* factor is the government's interest, including the fiscal and administrative burdens that would be required to impose additional or substitute procedural requirements. *See Mathews,* 424 U.S. at 335, 96 S.Ct. 893. There is no question that the City has a compelling interest in ensuring the health and safety of its citizens. *See State v. Wiltgen,* 737 N.W.2d 561, 570 (Minn.2007) (recognizing under the third *Mathews* factor that the State has a compelling interest in highway safety). And Sawh does not dispute that dangerous animals are a threat to the welfare and safety of the citizens of Lino Lakes. Moreover, while the cost and administrative burdens of additional procedures in this case may not be prohibitive, as Sawh argues, the Supreme Court recognized in *Mathews* that the City has an interest in avoiding the increased costs and administrative burdens that additional procedures would entail. *See* 424 U.S. at 348, 96 S.Ct. 893.

Balancing the three *Mathews* factors, we conclude that the process afforded to Sawh, including two hearings before the City Council, was constitutionally suffi-cient. The City provided Sawh with the basic requisites of due process: "notice and the opportunity to be heard" when his property interest in Brody was at stake. *See Sisson v. Triplett,* 428 N.W.2d 565, 568 (Minn.1988). Accordingly, we conclude that the City did not violate Sawh's procedural due process rights when it designated Brody as "dangerous" and subsequently ordered his destruction.

### III.

The second question presented by this case is whether the City's decision to designate Brody as "dangerous" was arbitrary or capricious. We review a quasi-judicial decision rendered by a city under a limited and "nonintrusive" standard of review. *Dietz v. Dodge Cnty.,* 487 N.W.2d 237, 239 (Minn.1992). Under that standard, we may not substitute our own findings of fact for those of a city, or engage in a de novo review of conflicting evidence. *City of Moorhead v. Minn. Pub. Utils. Comm'n,* 343 N.W.2d 843, 846 (Minn.1984). Instead, we must uphold a city's decision if the city has explained "how it derived its conclusion and [the city's] conclusion is reasonable on the basis of the record." *Minn. Power & Light Co. v. Minn. Pub. Utils. Comm'n,* 342 N.W.2d 324, 330 (Minn.1983).

Under the City Code, the City has the authority to designate an animal as "dangerous" if it receives evidence that:

(a) The animal has, when unprovoked, bitten, attacked or threatened the safety of a person or domestic animal as stated in division 3(a) above; or

(b) The animal has been declared potentially dangerous and the animal has then bitten, attac[k]ed, or threatened the safety of a person or domestic animal as stated in division 3(a) above.

Lino Lakes, Minn., Code of Ordinances § 503.15(5). Subdivision 3(a), in turn, defines a "dangerous animal" as one that has:

1. Caused bodily injury or disfigurement to any person on public or private property;

2. Engaged in any attack on any person under circumstances which would indicate danger to personal safety;

3. Exhibited unusually aggressive behavior, such as an attack on another animal;

4. Bitten one or more persons on two or more occasions; or

5. Been found to be potentially dangerous and/or the owner has personal knowledge of the same, the animal aggressively bites, attacks or endangers the safety of humans or domestic animals.

*Id.* § 503.15(3)(a). Thus, to uphold a finding that an animal is "dangerous," the City must find two facts. First, the dog must have committed one of the five acts listed in subdivision 3(a). Second, the animal must have "bitten, attacked or threatened" a person or another domestic animal without being provoked or after the animal in question had been declared "potentially dangerous."

Although the record in this case is not altogether clear, the parties appear to agree that the City premised its declaration that Brody was "dangerous" on the prior designation of Brody as "potentially dangerous" plus a subsequent "aggressive[ ] bite[ ]." *See* Lino Lakes, Minn., Code of Ordinances § 503.15(3)(a)(5). The record contains substantial evidence to support the City's decision. First, neither party disputes that Officer Wills had designated Brody as "potentially dangerous" 6 months before the October 15, 2010 incident involving D.I. Second, the record supports the City's finding that Brody aggres-

sively bit D.I. during the October incident. Police Chief Strege presented a photograph of the injury to D.I.'s arm to the City Council, D.I. testified about the nature of her injury, and Sawh's wife did not dispute D.I.'s claim that Brody bit D.I. on her arm and then her hip. Indeed, D.I. testified at the first hearing that Brody "came up and . . . bit [her]," pulled off her jacket, and then bit her again in the hip. The foregoing evidence provided a substantial and reasonable basis for the City's decision that Brody was "dangerous."

Sawh nonetheless argues that the City's decision is arbitrary and capricious because D.I. provoked Brody before the October 15, 2010 incident. However, under the City Code, lack of provocation is only one of two means for proving that an animal is "dangerous." *See* Lino Lakes, Minn., Code of Ordinances § 503.15(3)(a)(5). The other is to prove that an animal previously had been designated as "potentially dangerous"—a condition that was indisputably satisfied by Officer Wills after she responded to the April 8, 2010 incident involving C.S. Thus, whether D.I. provoked Brody during the October 15 incident is irrelevant because both parties appear to agree that the City relied on the prior "potentially dangerous" designation, not the lack of provocation accompanying the incident, in declaring Brody "dangerous." Accordingly, we conclude that the City's decision to designate Brody as "dangerous" was neither arbitrary nor capricious.

## IV.

The final question presented by this case is whether the City's decision to destroy Brody was arbitrary or capricious. Under the City Code,

[i]f an owner of an animal has subsequently violated the provisions under § 503.15 with the same animal, the ani-

mal must be seized by animal control. The owner may request a hearing as defined in § 503.15(7). If the owner is found to have violated the provisions for which the animal was seized, the animal control officer shall order the animal destroyed in a proper and humane manner and the owner shall pay the costs of confining the animal.

Lino Lakes, Minn., Code of Ordinances § 503.16(4). The City made the decision to destroy Brody after he attacked the furniture deliveryman, C.H., one day after the City Council upheld Officer Wills's designation of Brody as a "dangerous animal." At Sawh's request, the City Council then held another hearing, at which an animal control expert testified for Sawh and a number of Sawh's neighbors and friends submitted letters asserting that Brody was neither aggressive nor dangerous. After considering the evidence, the City Council determined that Sawh had committed a "subsequent offense" under the City Code, which required an animal control officer to destroy Brody. *See* Lino Lakes, Minn., Code of Ordinances § 503.16(4) ("If an owner of an animal has subsequently violated the provisions under § 503.15 with the same animal ... the animal control officer shall order the animal destroyed in a proper and humane manner...."). More specifically, the City Council determined at its November 22, 2010 meeting that Brody bit C.H. "on the left hand" without provocation.

Sawh disagrees with the City's decision to order Brody's destruction, arguing that the decision was arbitrary and capricious. Sawh's first argument is that the City improperly relied on its flawed "potentially dangerous" and "dangerous" designations in ordering Brody's destruction. However, we have already rejected Sawh's claims that the City deprived him of due process and that the designation of Brody as "dangerous" was unsupported by the evidence.

We therefore reject Sawh's argument because it is identical to the claims that we have already concluded have no merit.

■ Sawh's second argument is that the City erred when it concluded that C.H. did not provoke the November 9 bite. An animal is provoked under the City Code only when it is "purposely excited, stimulated, agitated, or disturbed." Lino Lakes, Minn., Code of Ordinances § 503.15(3)(d). In this case, there is no evidence that C.H. *purposely* excited, stimulated, agitated, or disturbed Brody. To the contrary, it is clear from the record and the City Council's findings that C.H. was neither told nor aware that Brody was in the basement. C.H. therefore could not have purposely excited a dog that he did not know was present. We therefore conclude that substantial evidence supports the City's finding that Brody was unprovoked when he bit C.H. on November 9. *See, e.g., Dokmo v. Indep. Sch. Dist. No. 11, Anoka–Hennepin,* 459 N.W.2d 671, 675 (Minn.1990).

■ Sawh's final argument is that we must reverse the City's decision and remand for further proceedings because the City failed to recognize that destroying Brody was a discretionary decision. In making his argument, however, Sawh relies on a flawed interpretation of the City Code. To be sure, the City had discretion—and indeed exercised that discretion—regarding whether to destroy Brody after Officer Wills had declared Brody "dangerous." *See* Lino Lakes, Minn., Code of Ordinances § 503.15(6) (providing the animal control officer with the "authority" to destroy a "dangerous animal"). But following a "subsequent offense," the City Code states that an "animal control officer *shall* order the animal destroyed in a proper and humane manner." *Id.* § 503.16(4) (emphasis added). The word

"shall" indicates a duty that is mandatory, not one that is optional or discretionary.[3] *See id.* § 101.03(2) (2011) (stating that "shall" means the "act referred to is mandatory"); *see also Webster's Third New International Dictionary* 2085 (3d ed.2002) (providing a definition of "shall" that states "used in laws, regulations, or directives to express what is mandatory"). Thus, while the City had discretion not to order Brody's destruction after the first hearing, once the City Council found that a "subsequent offense" had occurred, the *animal control officer* lacked discretion to do anything other than to order Brody's destruction. We therefore hold that the City's order of destruction was neither arbitrary nor capricious.[4]

### V.

For the foregoing reasons, we reverse the decision of the court of appeals, uphold the City's designation of Brody as "dangerous," and affirm the City's order of destruction.

Reversed.

Took no part, WRIGHT, J.

**3.** Sawh argues that the use of the word "shall" in the City Code is directory, rather than mandatory. But the mandatory-directory dichotomy is irrelevant here because this case does not involve a question about the consequences of an entity's *failure to comply* with the duties imposed upon it. *See Hans Hagen Homes, Inc. v. City of Minnetrista*, 728 N.W.2d 536, 541 (Minn.2007).

**4.** Sawh raises two additional arguments in his brief, but neither have any merit. First, Sawh argues that the City improperly relied on flawed expert testimony in ordering Brody's destruction. The challenged expert testimony, however, had no bearing on the City's finding that Sawh had committed a "subsequent offense." Therefore, even assuming that the City's consideration of such evidence

WRIGHT, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

was erroneous—an issue we need not decide—any error in this case was harmless because Brody's destruction was mandatory under section 503.16(4) once the City found that Sawh had committed a "subsequent offense." Second, Sawh argues that section 503.16(4) requires the *owner* of an animal to commit the "subsequent offense," not the animal. While Sawh correctly observes that the City Code refers to a violation by the animal's owner in defining a "subsequent offense," it is clear that the underlying acts constituting the "subsequent offense" must be committed by the animal, not the animal's owner. *See, e.g.,* Lino Lakes, Minn., Code of Ordinances § 503.15(5) (referring to an animal that has "bitten, attacked, or threatened the safety of a person or domestic animal").