# STATE OF MINNESOTA
## IN COURT OF APPEALS
### A24-2003

In re Defense and Indemnification of Alexander Vladimir Brown.

**Filed October 13, 2025**
**Affirmed**
**Ede, Judge**

City of Minneapolis

Joseph A. Kelly, Rebecca L. Duren, Kelly & Lemmons, P.A., St. Paul, Minnesota (for relator Alexander Vladimir Brown)

Kristyn Anderson, City Attorney, J. Haynes Hansen, Heather Robertson, Assistant City Attorneys, Minneapolis, Minnesota (for respondent City of Minneapolis)

Considered and decided by Smith, Tracy M., Presiding Judge; Cochran, Judge; and Ede, Judge.

## SYLLABUS

A peace officer's unauthorized use of a choke hold, as proscribed by Minnesota Statutes section 609.06, subdivision 3(a)(1) (2024), may constitute a violation of a legal standard and amount to malfeasance in office for purposes of a city's denial of defense and indemnification under Minnesota Statutes section 466.07, subdivision 1 (2024).

## OPINION

**EDE**, Judge

In this certiorari appeal, relator challenges respondent city's quasi-judicial decision to deny his request for defense and indemnification as to a civil-rights lawsuit against him. Relator argues that the city exceeded its statutory authority when it applied a decision-making process that he maintains conflicts with and is preempted by state law. He also

contends that the city's decision violated his constitutional rights. And relator maintains that the decision was unsupported by substantial evidence, arbitrary, and legally erroneous. We conclude (1) that the city did not exceed its statutory authority in applying the decision-making process that it used to deny relator's request for defense and indemnification, (2) that the city did not violate relator's constitutional rights, and (3) that the city's decision to deny relator defense and indemnification is supported by substantial evidence and is neither arbitrary nor legally erroneous. Accordingly, we affirm.

**FACTS**

Relator Alexander Vladimir Brown, a former police officer with the Minneapolis Police Department, challenges a quasi-judicial decision by respondent City of Minneapolis to deny his request for defense and indemnification in relation to a lawsuit against him. The plaintiff in that lawsuit, A.S., alleged that Brown violated A.S.'s civil rights during an incident in which Brown was working as a police officer, prior to his separation from employment with the police department. Brown sought defense and indemnification pursuant to Minnesota Statutes section 466.07, subdivision 1 (2024),[1] and the police

---

[1] Minnesota Statutes section 466.07, subdivision 1, provides:

> Subject to the limitations in section 466.04, a municipality or an instrumentality of a municipality shall defend and indemnify any of its officers and employees, whether elective or appointive, for damages, including punitive damages, claimed or levied against the officer or employee, provided that the officer or employee:
>> (1) was acting in the performance of the duties of the position; and
>> (2) was not guilty of malfeasance in office, willful neglect of duty, or bad faith.

department's internal policy and procedures on defense and indemnification. The city denied Brown's request after determining that he was ineligible for defense and indemnification because his acts constituted malfeasance in office, willful neglect, and bad faith. The facts below stem from the administrative record, which includes video footage captured by body-worn and surveillance cameras, as well as the complaint in A.S.'s civil-rights lawsuit against Brown.

In August 2020, Brown and other police officers responded to disturbances and unrest in downtown Minneapolis. Brown entered a mini-mall where a group of people appeared to be looting a store. He encountered A.S. as A.S. left the store and began running away from Brown down a hallway in the mini-mall. Brown chased A.S., approached A.S. from behind, and used his riot baton to knock A.S. down. A.S. got up and ran away from Brown in the opposite direction, and Brown again pursued him. Eventually, A.S. reached a locked door at the end of a side hallway and was cornered by Brown.

A.S. turned and attempted to evade Brown with a head-fake to A.S.'s left before moving right, taking steps around Brown and to Brown's side. As A.S. passed Brown, Brown grabbed A.S.'s shoulder and swung his baton toward A.S.'s head and upper back. Brown and A.S. fell to the ground. Positioning himself on top of A.S., Brown began repeatedly punching and elbowing A.S. in the upper back and head. Although A.S. did

---

We cite the most recent version of Minnesota Statutes section 466.07, subdivision 1, because it has not since been amended in relevant part. *See Interstate Power Co. v. Nobles Cnty. Bd. of Comm'rs*, 617 N.W.2d 566, 575 (Minn. 2000) (stating that, generally, "appellate courts apply the law as it exists at the time they rule on a case"). For the same reason, we also cite the current versions of other statutes referenced in this opinion, including criminal laws, which are not cited in relation to any criminal prosecution.

attempt to get up or move away from Brown while Brown was striking him, A.S. did not try to hit or otherwise hurt Brown. Keeping himself on top of A.S., Brown restrained A.S. with a choke hold from behind for approximately 13 seconds while A.S. was face-down on the ground with Brown on his back. Brown then placed A.S. in handcuffs and escorted A.S. outside.

Two days later, Brown wrote a statement describing the incident. Contrary to video footage, Brown's statement claimed that A.S. ran into Brown and knocked them both to the ground, which caused Brown's helmet to block his view. Brown said that he was "disoriented" and believed that he "had been hit in some way to the head." He stated that he punched A.S. in the head and then "lost full mobility of [his] right hand." And Brown asserted that he "was in fear of [his] life" and, to try to end the altercation, "used an unconscious neck restraint" on A.S. Based on this statement, the State of Minnesota charged A.S. with third-degree assault. These charges were later dismissed by the state in the interests of justice.

In May 2021, the city sent Brown a letter notifying him that he was being investigated for alleged violations of the police department's policies and procedures. Specifically, the city advised Brown that it was reviewing potential violations of the department's prohibition on the use of force and its prohibition on neck restraints and choke holds. The city scheduled an appointment for Brown with the internal affairs unit. At that time, Brown was on department-approved personal leave. Later that month, Brown was approved for duty-disability benefits and voluntarily separated from the police department.

In February 2024, A.S. sued the city and Brown; in the lawsuit, A.S. asserted that his civil rights had been violated. A.S. alleged that Brown had used "brutal and unjustified . . . force against [A.S.,] . . . including hitting [A.S.] with a baton, repeatedly punching [A.S.] in the face and head, and choking [A.S.] into unconsciousness." Moreover, A.S. claimed that Brown's statement was not truthful and was created to "justify [Brown's] needless use of deadly force." And A.S. asserted that Brown did not have a legal justification for the degree of force that he used, which A.S. maintained was in violation of the police department's policies and procedures, as well as A.S.'s constitutional rights.

One day after A.S. filed the lawsuit, Brown submitted a request to the city for defense and indemnification. Brown made this request pursuant to a city policy that allows an employee who receives a summons and complaint in a lawsuit to request defense and indemnification from the city:

> It is the policy of the City of Minneapolis to provide defense and indemnification in accordance with the public policy implicit in Minnesota Statutes, Chapter 466, to protect those properly performing governmental services on behalf of the City of Minneapolis against risk of liability resulting from lawsuits and to protect the taxpayers of Minneapolis from exposure to liability for acts committed not in performance of duties or through malfeasance, willful neglect of duty, or bad faith.

According to this policy, the city attorney is responsible for ensuring implementation and enforcement. If the city attorney considers denying a request for defense and indemnification, the employee is entitled to notice and an opportunity to be heard. In such a case, the city attorney is required to "make a quasi-judicial determination as to whether the city will defend and indemnify the employee."

5

A few days after Brown submitted his request for defense and indemnification, the city responded by letter. The city referenced A.S.'s lawsuit against Brown and wrote: "At this time, the city has not accepted defense and indemnification of the claims against you." The city advised Brown that he had "an opportunity to submit evidence and argument in support of [his] request for defense and indemnification" within 30 days. The letter explained that, at least seven days after Brown submitted his responsive materials, the city attorney would make a quasi-judicial determination about whether the city would defend and indemnify him. And the city stated in the letter that it would reimburse Brown "for reasonable attorney's fees incurred during the consideration period" if, "at the conclusion of this process, the city or a court determine[d] that defense and indemnification [was] appropriate." The city enclosed with the letter a copy of its defense-and-indemnification policy and procedures, which cites Minnesota Statutes section 466.07 and sets forth the exceptions for malfeasance in office, willful neglect of duty, and bad faith that are provided in subdivision 1.

In March 2024, Brown submitted a memorandum setting forth factual statements and legal arguments in response to the city's letter. He asserted that, during the subject incident, A.S. used "a substantial amount of force to run through Brown in his effort to avoid apprehension." Brown also wrote that his helmet fell off and he felt ringing in his head and ears, which led him to believe he had received a blow to the head. He further claimed that he struck A.S. to gain compliance and "immediately felt an overwhelming pain in his hand." And Brown asserted that he used a neck restraint when he was "left with no choice."

In November 2024, the city issued a "Quasi-Judicial Determination Denying Defense and Indemnification." In denying Brown's request, the city reasoned that Brown's "use of force against [A.S.] constituted malfeasance in office, willful neglect of duty, and/or bad faith," and the city concluded that it would "not defend and indemnify Brown against the claims asserted against him in [A.S.'s] lawsuit."

This certiorari appeal follows.

## ISSUES

I.    Did the city exceed its statutory authority in applying the decision-making process that it used to deny Brown's request for defense and indemnification?

II.   Did the city's decision violate Brown's constitutional rights?

III.  Is the city's decision to deny Brown defense and indemnification unsupported by substantial evidence, arbitrary, or legally erroneous?

## ANALYSIS

Under Minnesota Statutes section 466.07, subdivision 1, "[a] municipality is required to defend and indemnify its employee unless the municipality determines that the employee was not acting in the performance of the duties of the employee's position or was guilty of malfeasance, willful neglect of duty, or bad faith." *Anzures v. Ward*, 890 N.W.2d 127, 132 (Minn. App. 2017), *rev. denied* (Minn. Mar. 28, 2017). "[A] quasi-judicial decision by a municipality determining eligibility for defense and indemnification under section 466.07 may . . . be appealed by writ of certiorari." *Reetz v. City of St. Paul*, 956 N.W.2d 238, 244 (Minn. 2021). And such a decision is reviewed to determine "whether it is 'arbitrary, oppressive, unreasonable, fraudulent, under an

7

erroneous theory of law, or without any evidence to support it.'" *Id.* (quoting *Dietz v. Dodge County*, 487 N.W.2d 237, 239 (Minn. 1992)).

Brown raises three primary arguments in this appeal. First, he asserts that the city exceeded its statutory authority when it applied a decision-making process that he maintains conflicts with and is preempted by state law. Second, he contends that the city violated his constitutional rights to procedural due process, substantive due process, and equal protection. Third, he maintains that the city's decision to deny defense and indemnification was unsupported by substantial evidence in the record, arbitrary, and legally erroneous. We address each of Brown's arguments in turn.

## I.     The city did not exceed its statutory authority in applying the decision-making process that it used to deny Brown's request for defense and indemnification.

### A.     Quasi-Legislative Authority

Brown asserts that, "[p]rior to August 2020, the city would issue a preliminary determination as to whether a statutory exception [to defense and indemnification] applied" and, "[i]f there was an exception, the officer would have an opportunity to be heard by an administrative law judge [(ALJ)] to present evidence, witnesses, and argument." According to Brown, the policy that the city has since adopted and used in his case "remove[d] an impartial hearing and [gave] the [decision-making] authority to the city." Brown claims that the city's adoption of this policy and these procedures "improperly shift[ed] the burden of proof and permit[ted] the city to entirely control the process and [defense-and-indemnification] decision." In response, the city contends that this court lacks jurisdiction in this certiorari appeal to review the city's decision to adopt these policy and

8

procedural changes, which the city maintains was a quasi-legislative act. We agree with the city.

To explain why the city's decision to adopt its policy and procedures for resolving defense-and-indemnification requests was quasi-legislative, we must first discuss the scope of our certiorari review of quasi-judicial determinations. We have certiorari jurisdiction to review quasi-judicial decisions of local government entities when authorized by statute or when no other avenue of review is provided. Minn. Stat. § 480A.06 (2024); *In re Calm Waters Cannabis Co.*, 24 N.W.3d 507, 517 (Minn. App. 2025). Our certiorari jurisdiction includes the authority to review questions of law, including constitutional issues, arising from quasi-judicial decisions. *See Minn. Dep't of Corr. v. Knutson*, 976 N.W.2d 711, 718 (Minn. 2022) (instructing that "[c]ertiorari review is appropriate for all questions of law in . . . quasi[-]judicial proceedings" (quotations omitted)); *cf. In re On-Sale Liquor License, Class B.*, 763 N.W.2d 359, 371 (Minn. App. 2009) (noting that "[c]ertiorari is not a forum for trying issues of fact").

"In general, quasi-judicial decisions affect the rights of a few individuals analogous to the way they are affected by court proceedings." *Reetz*, 956 N.W.2d at 243 (quotations omitted). "[T]hree indicia of a quasi-judicial decision . . . must exist for certiorari review: (1) investigation into a disputed claim and weighing of evidentiary facts; (2) application of those facts to a prescribed standard; and (3) a binding decision regarding the disputed claim." *Lancaster v. Dep't of Hum. Servs.*, 18 N.W.3d 80, 83 (Minn. 2025) (quotation omitted). "The failure to meet any of the three indicia of [a] quasi-judicial [decision] . . . is fatal to a claim that the proceedings are quasi-judicial." *Citizens*

9

*Concerned for Kids v. Yellow Med. E. Indep. Sch. Dist. No. 2190*, 703 N.W.2d 582, 585 (Minn. App. 2005).

And "[c]ertiorari is an extraordinary remedy only available to review judicial or quasi-judicial proceedings and actions, and not administrative actions more generally." *Lancaster*, 18 N.W.3d at 83 (quotations omitted). "Certiorari is not available if an alternate right of review is provided by statute or the appellate rules[,]" *Reetz*, 956 N.W.2d at 243 (quotations and citation omitted), and it generally "is not available to review legislative or administrative actions," *Minn. Ctr. for Env't Advoc. v. Metro. Council*, 587 N.W.2d 838, 842 (Minn. 1999).[2] "Decisions are legislative if they have broad applicability and affect the rights of the public generally." *Zweber v. Credit River Twp.*, 882 N.W.2d 605, 609 (Minn. 2016) (quotation omitted). And the decision to make policy, including rules or regulations, is generally a part of an agency's quasi-legislative power. *Kmart Corp. v. County of Stearns*, 710 N.W.2d 761, 770 (Minn. 2006).

We conclude that the city's decision to adopt its policy and procedures for resolving defense-and-indemnification requests was a function of its quasi-legislative authority. The city's legislative action in adopting the policy and procedures has "broad applicability" and affects the rights of any employee seeking defense and indemnification from the city. *See*

---

[2] We acknowledge that there are limited circumstances in which we review quasi-legislative decisions. *See, e.g.*, *In Matter of Minnesota Power for Auth. to Increase Rates for Elec. Serv. in Minnesota*, 12 N.W.3d 477, 496 (Minn. App. 2024) (reviewing a quasi-legislative rate-design decision made by the Minnesota Public Utilities Commission). That said, there is no rule or statute that permits us to exercise certiorari review of the city's quasi-legislative decision to adopt its policy and procedures for resolving defense-and-indemnification requests.

*Zweber*, 882 N.W.2d at 609. Thus, to the extent that Brown challenges the city's decision to make policy and procedural changes to its process for determining whether to accept requests for defense and indemnification, those arguments fall outside the scope of our certiorari review and must be raised in a district court proceeding in the first instance. *See Interstate Power*, 617 N.W.2d at 574 ("Legislative acts are not reviewable by certiorari in the court of appeals, but by a direct action in district court."); *Watab Twp. Citizen Alliance v. Benton Cnty. Bd. of Comm'rs*, 728 N.W.2d 82, 93 (Minn. App. 2007) (advising that a party who wishes to challenge a legislative decision must first litigate the question in district court), *rev. denied* (Minn. May 15, 2007).

## B. Quasi-Judicial Authority

Brown also maintains that the city exceeded its statutory authority in applying the decision-making process that it used to deny Brown's request for defense and indemnification because Minnesota Statutes section 466.07, subdivision 1, "preempts the city's position that it has no duty to defend or indemnify [Brown]." The city counters that it "was well within its statutory authority to deny Brown defense and indemnification after finding that he was guilty of malfeasance in office, willful neglect of duty, and/or bad faith." The city's argument is persuasive.

The city does not dispute that its substantive determination to deny Brown defense and indemnification was a quasi-judicial decision. That determination resulted from an investigation into a disputed claim in which the city applied the facts presented against the standard set forth in its policies and state law. *See Lancaster*, 18 N.W.3d at 83. Furthermore, the determination had a binding effect on Brown's claim that he was entitled

11

to defense and indemnification. *See id.* And significantly, the determination affected only Brown's rights, not the rights of the public generally. *See Reetz*, 956 N.W.2d at 243. The city's determination was therefore a quasi-judicial decision and Brown's challenges to the merits of that decision—including his constitutional claims and his arguments that the decision is unsupported by substantial evidence, arbitrary, and legally erroneous, which we address below—are subject to our certiorari review. *See id.* at 244.

Inasmuch as Brown raises a preemption challenge to the city's authority over the quasi-judicial determination of his eligibility for defense and indemnification, his acknowledgment that "Minn. Stat. § 466.07 is silent as to who the decision-maker is or what procedure is required in making defense and indemnification decisions" defeats his claim. And binding precedent likewise contradicts Brown's assertion that the statute preempts the city's quasi-judicial authority to determine whether to defend or indemnify him. *See id.* at 244 (stating that "section 466.07 [does not] provide for any fact finder other than the municipality"); *Anzures*, 890 N.W.2d at 132 (concluding that "chapter 466 . . . treats municipalities as . . . decision-makers in matters related to tort liability," that the "only . . . reasonable interpretation" of Minnesota Statutes section 466.07, subdivision 1, is that "[a] municipality is required to defend and indemnify its employee unless the municipality determines that the employee was not acting in the performance of the duties of the employee's position or was guilty of malfeasance in office, willful neglect of duty, or bad faith," and that "the city attorney [was permitted] to decide whether an employee is entitled to defense and indemnification under Minn. Stat. § 466.07, subd. 1"). The city had

the quasi-judicial authority to decide whether Brown was eligible for defense and indemnification.

Contrary to Brown's contentions, the plain and unambiguous language of the statute neither requires that a city afford an officer a hearing before an ALJ in determining whether to grant the officer's request for defense and indemnification, nor prohibits the city from making that determination itself,[3] nor assigns the burden of proof to a particular party.[4] *See* Minn. Stat. § 466.07, subd. 1. And "one of the basic canons of statutory interpretation is that courts do not add words or phrases to an unambiguous statute." *Anzures*, 890 N.W.2d at 133 (quotation omitted). We therefore reject Brown's preemption argument and conclude that the city did not exceed its statutory authority in applying the decision-making process that it used to deny his request for defense and indemnification.

---

[3] Even under the previous ALJ process that Brown seems to argue was proper, the city had the final authority to accept or reject the ALJ's recommendation and to determine an officer's request for defense and indemnification. *See, e.g.*, *City of Minneapolis v. Lehner*, No. A16-0608, 2017 WL 24682, at *2 (Minn. App. Jan. 3, 2017) (nonprecedential opinion explaining that an ALJ's recommendation to the city about an officer's eligibility for defense and indemnification was submitted to the city for ultimate approval); *see also* Minn. R. Civ. App. P. 136.01, subd. 1(c) ("Nonprecedential opinions . . . are not binding authority except as law of the case, res judicata or collateral estoppel, but nonprecedential opinions may be cited as persuasive authority.").

[4] In any event, the city's policy and procedures for resolving defense-and-indemnification requests do not place the burden of proof on a requesting officer. Rather, they permit the officer to identify relevant evidence and to present arguments that the city considers in its decision-making process. And our careful review of the city's quasi-judicial determination here reveals that the city neither placed the burden on Brown nor denied his request for defense and indemnification based on an analysis of whether he carried such a burden. Instead, it is evident from the city's decision that the city analyzed whether it had carried the burden to establish that Brown was ineligible for defense and indemnification.

We next address Brown's challenges to the merits of the city's quasi-judicial determination.

## II. The city's decision did not violate Brown's constitutional rights.

Brown argues that the city violated his constitutional rights to (A) procedural due process, (B) substantive due process, and (C) equal protection under the law.[5] All of these issues are subject to de novo review. *See State v. Holloway*, 916 N.W.2d 338, 344 (Minn. 2018) ("Whether . . . government action violates substantive due process is a constitutional question, which [appellate courts] review de novo." (quotation omitted)); *N.H. v. Anoka-Hennepin Sch. Dist. No. 11*, 950 N.W.2d 553, 566 (Minn. App. 2020) ("We review alleged violations of the Equal Protection Clause de novo." (citing *Holloway*, 916 N.W.2d at 347); *ITW Food Equip. Grp. LLC v. Minnesota Plumbing Bd.*, 933 N.W.2d 523, 531–32 (Minn. App. 2019) ("Whether the government has violated a person's procedural-due-process rights is a question of law that this court reviews de novo.").

### A. Procedural Due Process

A person asserting a procedural-due-process claim must establish that they have been deprived of a protected life, liberty, or property interest without "constitutionally sufficient" procedural protections. *Hall v. State*, 908 N.W.2d 345, 358 (Minn. 2018).

Because it does not affect our ultimate decision to affirm, we assume without deciding that Brown had a protected property interest arising under Minnesota Statutes

---

[5] Brown does not argue that the analysis required under the United States and Minnesota Constitutions is different in this case. In considering his arguments, we therefore assume without deciding that the protections are the same under both constitutions.

14

section 466.07, subdivision 1, thus satisfying the first element of the procedural-due-process analysis. We therefore turn to an analysis of the second element—whether Brown's "interest has been interfered with to an extent that violates the Due Process Clause." *In re Individual 35W Bridge Litig.*, 806 N.W.2d 820, 829 (Minn. 2011).

To analyze whether a person's procedural-due-process rights were violated, Minnesota appellate courts apply the three-part test outlined in *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976). *See Sawh v. City of Lino Lakes*, 823 N.W.2d 627, 632, 633–35 (Minn. 2012) (applying "the three-factor balancing test from *Mathews*" in considering a procedural-due-process claim in a certiorari appeal). This test considers:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

### 1.      Private Interest Affected by Official Action

Under the first *Mathews* factor, the private interest affected by the city's decision is Brown's interest in defense and indemnification against A.S.'s civil-rights lawsuit. The city acknowledges that, given this interest, the first *Mathews* factor may weigh in Brown's favor. Still, the city contends that Brown's interest is less significant than, for example, a person's interest in their livelihood or employment.

We agree with the city. Our jurisprudence holds that a person's interest in their livelihood or employment weighs heavily in their favor. *See, e.g.*, *Staeheli v. City of St.*

15

*Paul*, 732 N.W.2d 298, 304 (Minn. App. 2007) (noting that a professional license is important to an individual's "livelihood and constitutes a substantial private interest"); *Sweet v. Comm'r of Hum. Servs.*, 702 N.W.2d 314, 320 (Minn. App. 2005) ("Employment in an individual's chosen field is significant and weighs heavily in the individual's favor."), *rev. denied* (Minn. Nov. 15, 2005). Although we are cognizant of the significant financial burden that defending against a lawsuit and potential liability may impose, that expense is different in character from an ongoing impediment to one's ability to engage in a chosen livelihood.

Thus, while we conclude that this *Mathews* factor weighs in Brown's favor, it does not weigh heavily because the city's decision to deny his defense-and-indemnification request neither deprives him of his livelihood nor restricts his employment.

### 2. Risk of Erroneous Deprivation of Interest Through Procedures Used

The second factor considers the risk of "erroneous deprivation of a protected interest" and the likely benefit of "additional safeguards." *Sawh*, 823 N.W.2d at 634. Brown asserts that he was not provided with meaningful notice or a reasonable opportunity to be heard.

We are mindful that, as Brown notes, the city did not disclose what evidence it intended to rely on in deciding whether to defend and indemnify him. While the city provided Brown with a copy of its defense-and-indemnification policy and procedures, it did not identify which particular police department policies it believed he had violated and which specific exception or exceptions under subdivision 1 of Minnesota Statutes section

16

466.07 it believed applied. And although Brown was allowed to submit written evidence and argument in support of his defense-and-indemnification request, the city did not offer him the opportunity to provide live testimony.

But Minnesota courts have consistently recognized that the basic rights of procedural due process required in quasi-judicial proceedings such as this are satisfied by "reasonable notice of hearing and a reasonable opportunity to be heard." *Barton Contracting Co. v. City of Afton*, 268 N.W.2d 712, 716 (Minn. 1978); *see also Mathews*, 424 U.S. at 348 ("The essence of due process is the requirement that a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it." (quotation omitted)). In other words, "[t]hese quasi-judicial proceedings do not invoke the full panoply of procedures required in regular judicial proceedings, civil or criminal, many of which would be plainly inappropriate in these quasi-judicial settings." *Barton Contracting*, 268 N.W.2d at 716; *see also Schwardt v. County of Watonwan*, 656 N.W.2d 383, 388 (Minn. 2003) (noting that the quality of evidence and testimony in a quasi-judicial proceeding does "not have to meet full judicial standards").

The record satisfies us that, under the specific circumstances of this case, the city afforded Brown reasonable notice and a reasonable opportunity to be heard for this *Mathews* factor to weigh in the city's favor. After A.S. filed the lawsuit and Brown submitted his request for defense and indemnification to the city, the city responded by letter within a few days, referencing A.S.'s lawsuit.[6] The city's letter notified Brown that

---

[6] We note that the complaint in A.S.'s lawsuit fully informed Brown of A.S.'s allegations concerning the incident at issue. And by the time he received the city's letter regarding

17

it "ha[d] not accepted defense and indemnification of the claims" against him and advised him that he had "an opportunity to submit evidence and argument in support of [his] request for defense and indemnification" within 30 days. And the city enclosed with the letter a copy of its defense-and-indemnification policy and procedures, which cite Minnesota Statutes section 466.07 and set forth the exceptions for malfeasance in office, willful neglect of duty, and bad faith that are provided in subdivision 1.

Thus, while the limited procedures used here might have neither offered "the full panoply of procedures required in regular judicial proceedings," *Barton Contracting*, 268 N.W.2d at 716, nor met "full judicial standards," *Schwardt*, 656 N.W.2d at 388, we still conclude that this *Mathews* factor weighs in the city's favor because the city at least provided Brown reasonable notice and a reasonable opportunity to be heard, *see Barton Contracting*, 268 N.W.2d at 716.

Our decision on this point is underscored by the lack of record evidence indicating any "probable value . . . of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335. Indeed, while Brown submitted a memorandum to the city setting forth factual statements and legal arguments in response to the city's letter that preliminarily declined to accept his request for defense and indemnification, his written and oral appellate arguments have neither articulated the probable value of substitute procedural safeguards nor pointed to any additional evidence or argument that he was precluded from presenting because of the procedures that the city used. As a result, whatever risk of erroneous

defense and indemnification, Brown had already written a statement describing the incident.

18

deprivation of Brown's interest in defense and indemnification that there may have been through the procedures used is mitigated by the lack of any probable value of additional or substitute procedural safeguards. *Cf. Staeheli*, 732 N.W.2d at 305 (declining to reverse a city's decision—despite concluding that a "time limit imposed at . . . [a city] hearing appear[ed] to have been arbitrary" and "inadequate"—because "there [was] . . . no indication in the record that relator was prejudiced by the . . . time limit," "[r]elator [did] not claim that he or any witnesses were unable to testify due to the time restraint, and relator ha[d] not shown that he was unable to present material evidence or that the [city] was unable to thoroughly consider an important issue due to the time limit").

### 3. Government Interest

The third *Mathews* factor considers the city's interest, "including the fiscal and administrative burdens that would be required to impose additional or substitute procedural requirements." *Sawh*, 823 N.W.2d at 635.

The city has a compelling interest in "ensur[ing] that public funds [are] not used to defend employees . . . guilty of malfeasance in office." *Queen v. Minneapolis Pub. Schs.*, 481 N.W.2d 66, 68 (Minn. App. 1992). The costs and administrative burdens of additional procedures also establish the city's interest in efficiently resolving defense-and-indemnification claims. The *Mathews* court recognized that the government has an interest in "conserving scarce fiscal and administrative resources" associated with additional procedural safeguards. 424 U.S. at 348; *see also Douglas v. City of Minneapolis*, 230 N.W.2d 577, 586 (Minn. 1975) (stating in a defense-and-indemnification case that it is "abundantly clear that a governmental body may not expend public funds unless the

19

primary purpose of the expenditure is public"). We therefore conclude that this *Mathews* factor also favors the city.

Balancing the three *Mathews* factors, the first factor weighs in Brown's favor, but the remaining two factors weigh in favor of the city. We conclude that the process the city afforded Brown in making its quasi-judicial determination was constitutionally sufficient and did not violate his procedural-due-process rights.

### B. Substantive Due Process

"[S]ubstantive due process protects individuals from certain arbitrary, wrongful government actions." *In re Linehan*, 594 N.W.2d 867, 872 (Minn. 1999). This protection is rooted in the Fourteenth Amendment of the United States Constitution, which prohibits states from depriving any person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1; *see also* Minn. Const. art. I, § 7.

When the government's conduct is "so egregious that it shocks the conscience," it has violated a person's constitutional rights to substantive due process. *Mumm v. Mornson*, 708 N.W.2d 475, 487 (Minn. 2006) (quotation omitted); *see also State v. Hill*, 871 N.W.2d 900, 906 (Minn. 2015) ("In the context of executive action, . . . substantive due process prevents the government from engaging in conduct that shocks the conscience . . . or interferes with rights implicit in the concept of ordered liberty[.]" (quotations omitted)). But "[o]nly the most extreme instances of governmental misconduct satisfy this exacting standard." *Mumm*, 708 N.W.2d at 487; *see also Hill*, 871 N.W.2d at 906 (explaining that acts satisfying the "shocks-the-conscience standard . . . often evince[e] deliberate and unjustifiable injurious intent" (quotations omitted)); *Northpointe Plaza v. City of*

20

*Rochester*, 465 N.W.2d 686, 690 (Minn. 1991) (observing that "the theory of substantive due process is properly reserved for truly egregious and extraordinary cases" (quotation omitted)).

Brown argues that the city violated his substantive-due-process rights because its quasi-judicial determination was not based on substantial evidence, did not give appropriate weight to the evidence Brown presented, and lacked a rational basis, thereby making it arbitrary. These arguments are not supported by the record.

As expanded on below, substantial evidence supports the city's decision, and the quasi-judicial determination is neither arbitrary nor legally erroneous. While Brown urges us to give greater weight to the evidence that he presented than the city did in its decision, we "do[] not find facts or reweigh the evidence." *Minn. Dep't of Corr. v. Knutson*, 981 N.W.2d 773, 781 (Minn. App. 2022), *rev. denied* (Minn. Jan. 25, 2023). And because there is evidence in the record that supports the city's determination, we will not substitute our judgment for that of the city. *See id.*; *see also VanLandschoot v. City of Mendota Heights*, 336 N.W.2d 503, 509 (Minn. 1983) ("The fact that a court reviewing the action of a municipal body may have arrived at a different conclusion . . . does not invalidate the judgment of the city officials if they acted in good faith and within the broad discretion accorded them by statutes and the relevant ordinances.").

Given the record before us, the city's decision to deny Brown defense and indemnification is not an extraordinary or extreme instance of governmental misconduct so egregious that it satisfies the exacting shocks-the-conscience standard. *See Mumm*, 708 N.W.2d at 487; *see also Northpointe Plaza*, 465 N.W.2d at 690. Nor does the city's quasi-

judicial determination evince any deliberate and unjustifiable injurious intent that interferes with rights implicit in the concept of ordered liberty. *See Hill*, 871 N.W.2d at 906.

Brown is not entitled to relief on his substantive-due-process claim.

### C.    Equal Protection

Both the United States Constitution and the Minnesota Constitution guarantee that no person shall be denied equal protection of the laws. U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 2. These constitutional rights to equal protection apply to state actions, ensuring that governmental decision-makers do not treat differently persons who are in all relevant respects alike. *See Holloway*, 916 N.W.2d at 347.

The threshold inquiry for an equal-protection analysis is whether "the claimant is similarly situated in all relevant respects to others whom the claimant contends are being treated differently." *Schroeder v. Simon*, 985 N.W.2d 529, 549 (Minn. 2023) (quoting *State v. Lee*, 976 N.W.2d 120, 125–26 (Minn. 2022)). Equal protection does not require the government to treat persons who are differently situated as though they were the same. *Holloway*, 916 N.W.2d at 347. Minnesota courts "routinely reject[]" equal-protection claims when a party cannot make the threshold showing that they are "similarly situated to those whom they contend are being treated differently." *State v. Cox*, 798 N.W.2d 517, 521 (Minn. 2011); *see also Holloway*, 916 N.W.2d at 347 (noting that, to establish an equal-protection claim, a claimant must show that they are "treated differently from others to whom the claimant is similarly situated in all relevant respects" (quotation omitted)). Courts require claimants to demonstrate that they are part of an "objectively identifiable" class that is treated differently than a similarly situated class. *Forslund v. State*, 924 N.W.2d

25, 35–36 (Minn. App. 2019) ("A necessary underlying premise of this threshold requirement is that the groups must be objectively identifiable by some characteristic other than their alleged shared harm by the challenged government action."). Thus, absent a showing that the claimant belongs to "a discrete and identifiable group," an equal-protection claim fails. *Id.* at 36 (quotation omitted).

In support of his equal-protection argument, Brown asserts that the city provided defense and indemnification to other police officers who were accused of misconduct during the same period as the events of this case. He thus contends that the city's decision to defend and indemnify those officers but deny his similar request violated his equal-protection rights. The city responds that the cases Brown cites are not similar and involve distinct fact patterns. Again, we agree with the city.

Brown does not identify "a discrete and identifiable group" of which he is a member. *Id.* (quotation omitted). And while equal-protection claims may be brought by "a class of one," Brown does not claim to be part of a class of one, nor has he established intentional discrimination. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (directing that class-of-one claimants may prevail by showing they have "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment"). A claimant's inability to identify a discrete and identifiable class is dispositive. *Forslund*, 924 N.W.2d at 36.

Because Brown has not shown that he is part of such a class, his equal-protection argument is unavailing. *See id.*

**III.    The city's decision to deny Brown defense and indemnification is supported by substantial evidence and is neither arbitrary nor legally erroneous.**

Brown maintains that the city's decision to deny defense and indemnification was unsupported by substantial evidence, arbitrary, and legally erroneous.

As mentioned above, these arguments require certiorari review of whether the city's quasi-judicial determination "is arbitrary, oppressive, unreasonable, fraudulent, under an erroneous theory of law, or without any evidence to support it." *Reetz*, 956 N.W.2d at 244 (quotation omitted). In analyzing evidentiary support, our "[j]udicial review of quasi-judicial decisions is conducted under the 'substantial evidence test.'" *Am. Fed'n of State, Cnty. & Mun. Emps., Council No. 14, St. Paul v. County of Ramsey*, 513 N.W.2d 257, 259 (Minn. App. 1994) (quoting *In re Signal Delivery Serv.*, 288 N.W.2d 707, 710 (Minn. 1980)). Substantial evidence is "1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than some evidence; 4) more than any evidence; and 5) evidence considered in its entirety." *Id.* (quotation omitted). And in analyzing arbitrariness, we have reviewed whether a quasi-judicial determination (1) "relied on factors which the legislature had not intended . . . [for] consider[ation]"; (2) "entirely failed to consider an important aspect of the problem"; (3) "offered an explanation for the decision that runs counter to the evidence"; or (4) "is so implausible that it could not be ascribed to a difference in view or the product of [the decision-maker's] expertise." *Minn. Transitions Charter Sch. v. Comm'r of the Minn. Dep't of Educ.*, 844 N.W.2d 223, 235 (Minn. App. 2014) (quotation omitted), *rev. denied* (Minn. May 28, 2014). Although appellate courts "review questions of law de novo," *Reetz*,

24

956 N.W.2d at 247, they neither "substitute [their] own findings of fact for those of a city" nor "engage in a de novo review of conflicting evidence," *Sawh*, 823 N.W.2d at 635.

Minnesota law provides that "a municipality . . . shall defend and indemnify" an "officer or employee," as long as the "officer or employee . . . (1) was acting in the performance of the duties of the position" and "(2) was not guilty of malfeasance in office, willful neglect of duty, or bad faith." Minn. Stat. § 466.07, subd. 1. Here, the city's denial of Brown's request for defense and indemnification turned on its determinations under subdivision 1(2) that Brown had committed malfeasance in office, willful neglect of duty, and bad faith.[7] We discern no reason to reverse the city's determination that Brown committed malfeasance in office and affirm on that basis.[8]

"[T]he predominant judicial interpretation of malfeasance has carried a connotation of unlawfulness." *In re Ventura*, 600 N.W.2d 714, 719 (Minn. 1999) (order) (Blatz, C.J.) (chief justice reviewing recall petition in her individual capacity under Minn. Stat. § 211C.05 (2024)). Although malfeasance in office is "not susceptible of an exact definition," the Minnesota Supreme Court has described it as "evil conduct or an illegal

---

[7] The parties do not dispute that Brown was on duty and entered the mini-mall to respond to a group of people who appeared to be looting a store when the underlying incident occurred. *See id.*, subd. 1(1).

[8] In light of our conclusion as to malfeasance in office, we need not address Brown's challenges to the city's determinations that his conduct constituted willful neglect of duty and bad faith. *See* Minn. Stat. § 466.07, subd. 1(2) (providing that exceptions to defense and indemnification include that an officer or employee was "guilty of malfeasance in office, willful neglect of duty, *or* bad faith" (emphasis added)); *cf. State v. Loge*, 608 N.W.2d 152, 155 (Minn. 2000) (describing how "two alternate concepts" in a statute were "separated by the disjunctive 'or,'" which "require[s] that only one of the possible factual situations be present in order for the statute to be satisfied").

25

deed, the doing of that which one ought not to do, the performance of an act by an officer in [their] official capacity that is wholly illegal and wrongful." *Jacobsen v. Nagel*, 96 N.W.2d 569, 573 (Minn. 1959) (quotation omitted). Conduct is "unlawful or wrongful" if it is "contrary to a legal standard established by law, rule, or case law." *Jacobs v. City of Columbia Heights*, 9 N.W.3d 536, 541 (Minn. 2024) (quoting *Ventura*, 600 N.W.2d at 719). The supreme court has established a three-factor test when evaluating whether an actor's conduct constitutes malfeasance in the performance of the actor's duties. *Id.* Under this test, the actor's conduct must: (1) affect the "performance of official duties"; (2) "relate to something of a substantial nature directly affecting the rights and interests of the public"; and (3) be "the performance of an act by an officer in [his] official capacity that is wholly illegal and wrongful." *Id.* (quoting *Jacobsen*, 96 N.W.2d at 573).

Substantial evidence in the record supports the city's decision in relation to each of the above factors. *See id.* (noting that each element must be satisfied). It is uncontroverted that Brown was on duty and entered the mini-mall to respond to a group of people who appeared to be looting a store at the time the underlying incident occurred; his conduct therefore affected the "performance of official duties." *Id.* (quotation omitted). And Brown's use of unreasonable force by applying a prohibited choke hold on A.S.—which is a determination the city made that is supported by substantial evidence in the record, as discussed below—"relate[s] to something of a substantial nature directly affecting the rights and interests of the public." *Id.* (quotation omitted); *see also City of Minneapolis v. Police Officers' Fed'n of Minneapolis*, 566 N.W.2d 83, 89 (Minn. App. 1997) ("It is axiomatic that there is a well-defined and dominant public policy against police officers

26

using excessive force."); *see also* U.S. Const. amend. IV (prohibiting unreasonable seizures by the government); Minn. Const. art. I, § 10 (same); Minn. Stat. § 609.06, subd. 3(a)(1) (2024)[9] (listing "a choke hold"[10] as one of the restraints that "[a] peace officer[11] may not use[,] . . . unless section 609.066 authorizes the use of deadly force to protect the peace officer or another from death or great bodily harm"). Thus, our analysis focuses on whether the record supports a determination that Brown's actions were "wholly illegal and wrongful." *Jacobsen*, 96 N.W.2d at 573.

---

[9] The relevant conduct by Brown occurred in August 2020, after the Minnesota Legislature amended the statute to add the choke-hold prohibition. *See* 2020 Minn. Laws ch. 1, § 8, at 1267, 1284 (providing an effective date of July 24, 2020, which was "the day following final enactment" by the governor on July 23, 2020); *see also Luna-Pliego v. State*, 904 N.W.2d 916, 918 (Minn. App. 2017) (explaining that a statute that was "effective the day following final enactment" became effective the day after the governor signed the bill into law).

[10] Under Minnesota Statutes section 609.06, subdivision 3(b) (2024), a "choke hold" is defined as both "a method by which a person applies sufficient pressure to a person to make breathing difficult or impossible, and includes but is not limited to any pressure to the neck, throat, or windpipe that may prevent or hinder breathing, or reduce intake of air" and "applying pressure to a person's neck on either side of the windpipe, but not to the windpipe itself, to stop the flow of blood to the brain via the carotid arteries."

[11] Under Minnesota Statutes section 609.066, subdivision 1 (2024), "'[p]eace officer' has the meaning given in section 626.84, subdivision 1[,]" which in turn defines "peace officer" as

> an employee or an elected or appointed official of a political subdivision or law enforcement agency who is licensed by the [Board of Peace Officer Standards and Training], charged with the prevention and detection of crime and the enforcement of the general criminal laws of the state and who has the full power of arrest.

Minn. Stat. § 626.84, subd. 1(c) (2024). There is no dispute that Brown met the definition of a "peace officer" under Minnesota law at the time of the underlying incident.

The city determined that Brown committed malfeasance in office because he violated police department policy by striking A.S. with a baton, punching A.S.'s head and neck, using a choke hold, and submitting a dishonest statement. Specifically with respect to the choke hold,[12] the city reasoned that, at the time of the underlying incident, the manner in which Brown restrained A.S.'s neck was defined by subdivision 3(b) of section 609.06 as a "choke hold" that was "prohibited by law, except in deadly force situations, which . . . this was not." Whether Brown's use of a choke hold in violation of section 609.06 may constitute malfeasance in office for purposes of section 466.07 is a matter of first impression.

Subdivision 3(a)(1) of section 609.06 limits the use of choke holds to circumstances in which "section 609.066 authorizes the use of deadly force to protect the peace officer or another from death or great bodily harm." Minn. Stat. § 609.06, subd. 3(a)(1). "Deadly force" refers to force used "with the purpose of causing, or which the actor should reasonably know creates a substantial risk of causing, death or great bodily harm." Minn. Stat. § 609.066, subd. 1. As relevant to subdivision 3(a)(1) of section 609.06,

> the use of deadly force by a peace officer in the line of duty is justified . . . if an objectively reasonable officer would believe, based on the totality of the circumstances known to the officer at the time and without the benefit of hindsight, that such force is necessary:
>
> (1) to protect the peace officer or another from death or great bodily harm, provided that the threat:

---

[12] As noted above, we decline to review the other grounds on which the city relied to support its malfeasance-in-office determination because we conclude that its reasoning as to the choke hold establishes a sufficient basis to affirm.

28

(i) can be articulated with specificity;

(ii) is reasonably likely to occur absent action by the law enforcement officer; and

(iii) must be addressed through the use of deadly force without unreasonable delay.

Minn. Stat. § 609.066, subd. 2(a) (2024). This statutory scheme establishes a legal standard for the use of choke holds by peace officers. We therefore hold that a peace officer's unauthorized use of a choke hold, as proscribed by Minnesota Statutes section 609.06, subdivision 3(a)(1), may constitute a violation of a legal standard and amount to malfeasance in office for purposes of a city's denial of defense and indemnification under Minnesota Statutes section 466.07, subdivision 1. *See Jacobs*, 9 N.W.3d at 541; *Jacobsen*, 96 N.W.2d at 573.

We now apply this holding in reviewing the city's decision that "there [was] no evidence that [A.S.] threatened death or great bodily harm to Brown or anyone else." In support of its determination, the city found: that, "[w]hen [A.S.] reached the locked door and was forced to double back, he attempted to merely evade Brown"; that, "[o]nce Brown brought [A.S.] to the ground, [A.S.] did not make any effort to harm or attack Brown[,] but rather "tried to free himself from Brown's attacks"; and that "there is no indication that [A.S.] was carrying any weapons during the encounter, nor any indication that Brown believed that [A.S.] was carrying any weapons." Substantial evidence—including but not limited to video recorded by Brown's body-worn camera and the mini-mall's surveillance

29

system,[13] both of which the city cited throughout its quasi-judicial decision—supports the city's determination. *See Am. Fed'n of State, Cnty. & Mun. Emps.*, 513 N.W.2d at 259. The record reflects that, during the incident, Brown pursued A.S. for a property crime and not a crime of violence. A.S. was unarmed and did not use or threaten to use deadly force against Brown or others. The record therefore supports the city's decision that Brown's use of a choke hold on A.S. under circumstances in which he was not authorized to employ deadly force to protect himself or another from death or great bodily harm was malfeasance in office because it was "unlawful or wrongful," i.e., contrary to the legal standard established by subdivision 3(a)(1) of section 609.06.[14] *Jacobs*, 9 N.W.3d at 541 (quotation omitted).

Moreover, the city's analysis of this evidence shows that its quasi-judicial determination was not arbitrary because the city did not rely on factors that the legislature did not intend it to consider, did not ignore an important aspect of the problem, did not offer an explanation that is contrary to the record, and did not make an implausible decision that cannot be attributed to a difference in view or the city's experience in resolving defense-and-indemnification requests. *See Minn. Transitions Charter Sch.*, 844 N.W.2d at

---

[13] The surveillance video is referenced as support for factual allegations in multiple paragraphs of A.S.'s complaint against the city and Brown.

[14] Insofar as Brown challenges the city's factual findings based on his assertions that he was in fear for his life and disoriented when his helmet blocked his view, we "do[] not find facts or reweigh the evidence" in this certiorari appeal. *Knutson*, 981 N.W.2d at 781; *see also Sawh*, 823 N.W.2d at 635. Instead, our review in this regard is limited to whether the city's decision is supported by substantial evidence. *See Am. Fed'n of State, Cnty. & Mun. Emps.*, 513 N.W.2d at 259.

235. Indeed, Brown's arguments that the city's decision is arbitrary reiterate claims that we have already rejected, including that the city did not adequately consider evidence about his use of force during the incident, improperly shifted the burden of proof to him, and erroneously denied him defense and indemnification, despite its decisions as to other police officers who were accused of misconduct around the same time. We conclude that the city's quasi-judicial determination was not arbitrary.

Lastly, Brown argues for the first time on appeal that he is entitled to defense and indemnification under Minnesota Statutes section 471.44, subdivision 1 (2024).[15] But Brown did not cite that statute in his memorandum supporting his request for defense and indemnification, and the city did not consider it in denying his request. Brown has therefore forfeited any argument under subdivision 1 of section 471.44 and this issue is not properly before us. *See Minnesota Internship Ctr. v. Minnesota Dep't of Educ.*, 996 N.W.2d 34, 47 (Minn. App. 2023) ("A reviewing court must generally consider only those issues that the record shows were presented [to] and considered by the [decision-maker] in deciding the

---

[15] Minnesota Statutes section 471.44, subdivision 1, provides in relevant part:

> [E]very city . . . employing . . . police officers . . . shall be required to furnish legal counsel to defend any . . . police officer . . . employed by any such governmental subdivision in all actions brought against such officer to recover damages for alleged false arrest or alleged injury to person, property or character, when such alleged false arrest or alleged injury to person, property or character was the result of an arrest made by such officer in good faith and in the performance of official duties and pay the reasonable costs and expenses of defending such suit, including witness fees and reasonable counsel fees, notwithstanding any contrary provisions in the laws of this state or in the charter of any such governmental subdivision.

matter before it." (quoting *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988)), *aff'd*, 10 N.W.3d 178 (Minn. 2024); *see also In re A.D.*, 883 N.W.2d 251, 261 (Minn. 2016) (discussing the *Thiele* forfeiture analysis in the context of a certiorari appeal). In other words, because there is no quasi-judicial decision by the city denying a request by Brown under Minnesota Statutes section 471.44, subdivision 1, this issue is not within the scope of our certiorari review.

In sum, we conclude that the city's decision to deny Brown defense and indemnification is supported by substantial evidence and is neither arbitrary nor legally erroneous.

## DECISION

The city did not exceed its statutory authority in applying the decision-making process that it used to deny Brown's request for defense and indemnification. Its decision did not violate Brown's constitutional rights to procedural due process, substantive due process, and equal protection under the law. A peace officer's unauthorized use of a choke hold, as proscribed by Minnesota Statutes section 609.06, subdivision 3(a)(1), may constitute a violation of a legal standard and amount to malfeasance in office for purposes of a city's denial of defense and indemnification under Minnesota Statutes section 466.07, subdivision 1. The city's decision is supported by substantial evidence, is neither arbitrary nor legally erroneous, and the city did not err in determining Brown committed malfeasance in office by using an unauthorized choke hold on A.S.

**Affirmed.**